**MORELITE CONSTRUCTION CORP. (A DIVISION OF MORELITE ELECTRIC SERVICE, INC.), Petitioner-Appellant,**

**v.**

**NEW YORK CITY DISTRICT COUNCIL CARPENTERS BENEFIT FUNDS and the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America, Respondents-Appellees.**

**No. 86, Docket 84–7351.**

United States Court of Appeals, Second Circuit.

Submitted Oct. 5, 1984.

Decided Nov. 5, 1984.

Wilfred L. Davis & Stephen Davis, New York City, for petitioner-appellant.

Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, for respondent-appellee Ben. Funds.

Bart, Lew & Monat, New York City, for respondent-appellee Union.

Before KAUFMAN and WINTER, Circuit Judges, and WYZANSKI, Senior District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

In deciding this appeal, we are once again called upon to address the elusive standards under which an arbitrator's award may be vacated pursuant to Section 10 of the United States Arbitration Act, 9 U.S.C. § 10 (1982). Specifically, the question before us is whether a father-son relationship between an arbitrator and an officer of one party to the arbitration rises to

---

* The Honorable Charles E.Wyzanski, Jr., Senior District Judge, District of Massachusetts, sitting by designation.

the level of "evident partiality" required by Section 10 for vacating an award. Notwithstanding our traditional reluctance to inquire into the merits of an arbitrator's award, or to require of an arbitrator the same demanding level of impartiality as that dictated for judges, we believe this relationship deprived the opposing party of the impartiality to which it has a right. Accordingly, we reverse the decision of the district court, and remand with instructions to vacate the award.

An inquiry into issues of fairness, bias, partiality and the like overflows with factual questions. Consequently, we set forth the concrete background of the instant dispute before turning to the legal issues.

### FACTS

Appellant Morelite Construction Corp. ("Morelite"), a division of Morelite Electric Services, Inc., is a construction contractor. Appellees are The District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Union") and the Trustees of the New York City District Council Carpenters Benefit Funds (the "Benefit Funds"). The instant appeal arises from Morelite's alleged non-payment of contributions to the Benefit Funds pursuant to a collective bargaining agreement between Morelite and the District Union.

In 1979 and 1980, Morelite was engaged to perform contracting services in connection with two construction projects in New York City. Morelite entered into job agreements with the District Union applicable to each site. The agreements expressly incorporated the construction industry's "Master Collective Bargaining Agreement" and provided for arbitration of disputes arising from the agreements.

In 1980, the Benefit Funds audited Morelite's financial records, and charged that the company was delinquent in contributions to the Funds in the amount of some $80,000. On October 8, 1980, the Benefit Funds served notice upon Morelite of their intention to arbitrate their claim for unpaid contributions. Later that month, Morelite commenced a proceeding in New York State Supreme Court seeking to stay arbitration. The Benefit Funds removed the action to the United States District Court for the Southern District of New York, and cross-petitioned to compel arbitration. By order dated May 6, 1981, Judge Cannella denied Morelite's petition, and granted the Benefit Funds' cross-petition on the condition that the District Union be joined as a party to the arbitration (which it subsequently was).

On March 11, 1982, Morelite moved in the District Court to disqualify Patrick M. Campbell, Jr. as the arbitrator, because his father was then a Vice-President of the United Brotherhood of Carpenters and Joiners of America, the international union of which the District Union was a local. Campbell, Sr. also served as the international union's supervisor and trustee of the District Union. Judge Cannella denied the motion, holding the court had no authority to entertain an attack on an arbitrator's partiality until after the rendition of an award,[1] and ordered the arbitration to proceed forthwith.

Hearings were held before Patrick Campbell, Jr. during the months of April and May of 1982, and in June of 1983, he filed his opinion and award. Campbell found that Morelite was "delinquent in payment of fringe benefit monies due under its written agreements and is also obligated to pay liquidated damages and interest on its delinquency." In sum, the District Union was awarded $128,429.50 plus interest from the date of the award.

In September 1983, Morelite moved pursuant to 9 U.S.C. § 10 (1982) to set aside the arbitration award, again claiming that the position of Campbell's father—who, during the pendency of the arbitration, had been named General President of the international union—precluded Campbell from acting impartially. Judge Cannella, noting

---

1. See *Sanko S.S. Co. v. Cook Industries,* 494 F.2d 1260, 1264 n.4 (2d Cir.1973); *Marc Rich & Co. v. Transmarine Seaways Corp.,* 443 F.Supp. 386, 387 (S.D.N.Y.1978).

that he "remain[ed] troubled by the relationship," nevertheless denied the motion and granted the District Union's cross-petition to confirm the arbitrator's award. In March of 1984, final judgment was entered in favor of the Benefit Funds and the District Union, and Morelite timely filed a notice of appeal.

## DISCUSSION

In 1925, Congress promulgated the United States Arbitration Act, 9 U.S.C. §§ 1–14, which set forth the delicate relationship between the role of private arbitration and the federal courts. Section 10 of the Act delineates the grounds upon which a court may vacate an arbitrator's award. Subsection (b) provides that such a basis exists "[w]here there was evident partiality ... in the arbitrator[ ]...."

Exactly what constitutes "evident partiality" by an arbitrator is a troublesome question. The Supreme Court, in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), attempted to resolve the issue, but the result of that decision appears to be ongoing uncertainty. In that case, a supposedly neutral arbitrator was discovered to have an undisclosed business relationship with the successful party to the arbitration. The arbitrator had been paid approximately $12,000 by the party in consulting fees, and the relationship "went so far as to include the rendering of services on the very projects involved in [the arbitration]." *Id.* at 146, 89 S.Ct. at 338.

Justice Black, writing for a plurality of four justices, appeared to impose upon arbitrators the same lofty ethical standards

required of Article III judges.[2] The Justice suggested, in fact, that "we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review." *Id.* at 149, 89 S.Ct. at 339. Using language that has since been seized upon by unsuccessful parties to arbitration, Justice Black concluded by writing that arbitrators, like judges, must avoid even the "appearance of bias." *Id.* at 150, 89 S.Ct. at 340.

Four justices, however, do not constitute a majority of the Supreme Court. Justice White, writing for himself and Justice Marshall, concurred in the result, but made clear the Court was not holding that arbitrators' and judges' ethical standards are coextensive. Justice White wrote:

> The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges. It is often because they are men of affairs, not apart from that of the marketplace, that they are effective in their adjudicatory function ... This does not mean the judiciary must overlook outright chicanery in giving effect to their awards; that would be an abdication of our responsibility. But it does mean that arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial. I see no reason automatically to disqualify the best in-

2. 28 U.S.C. § 455 (1982), which is derived from Canon 3 of the Code of Judicial Conduct, provides as follows:

"(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

"(b) He shall also disqualify himself in the following circumstances:

\* \* \* \* \* \*

"(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding."

It is clear that Campbell would be disqualified under these rules from adjudicating the dispute at issue.

formed and most capable potential arbitrators.

*Id.* Accordingly, much of Justice Black's opinion must be read as dicta,[3] and we are left in the dark as to whether an "appearance of bias" will suffice to meet the seemingly more stringent "evident partiality" standard of 9 U.S.C. § 10. Against this murky backdrop of Supreme Court precedent, we examine prior decisions in this circuit.

The closest we can come to the gleaning of guidance in this elusive sphere is the decision in *International Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548 (2d Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981). We held there that the mere fact a neutral arbitrator was also a witness in another arbitration involving the same law firms representing the parties in the arbitration in question did not provide grounds for vacating the award on the basis of his "evident partiality" *Id.* at 551. In reaching this conclusion, Judge Lumbard wrote, "the Supreme Court in *Commonwealth Coatings* did not expand the § 10 standard of 'evident partiality' to include 'appearance of bias.' *Id.* In the following sentence, however, he acknowledged that even an " 'appearance of bias' [in this case] seems to us, at best, to be speculation without substance." *Id.* (citation omitted). Accordingly, it appears that his statement to the effect that "evident partiality" requires a showing of more than a mere "appearance of bias" was unnecessary to the result in that case, and thus must be read as something less than an absolute and final determination of the matter. We are left, then, with little guidance concerning what standard is to be applied in construing the "evident partiality" language of the statute. It is to that question we now turn.

In attempting to delineate standards of impartiality on a relatively clean slate, we are struck by the competing interests inherent in the use of arbitration. On the one hand, parties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute. See *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960); *International Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548, 552 (2d Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981). Familiarity with a discipline often comes at the expense of complete impartiality. Some commercial fields are quite narrow, and a given expert may be expected to have formed strong views on certain topics, published articles in the field and so forth. Moreover, specific areas tend to breed tightly knit professional communities. Key members are known to one another, and in fact may work with, or for, one another, from time to time. As this Court has noted, "[e]xpertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it...." *Andros Compania Maritima, S.A. v. Marc Rich & Co.,* 579 F.2d 691, 701 (2d Cir.1978).

■ It comes as no surprise, then, that the standards for disqualification of arbitrators have been held to be less stringent than those for federal judges. *See Merit Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983). For to disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all. Mindful of the trade-off between expertise and impartiality, and cognizant of the voluntary nature of submitting to arbitration, we read Section 10(b) as requiring a showing of something more than the mere "appearance of bias" to vacate an

---

**3.** It might be thought that Justice Black's opinion represents the views of six members of the Court, for Justice White wrote that he was "glad to *join* my Brother Black's opinion." *Commonwealth Coatings, supra,* 393 U.S. at 150, 89 S.Ct. at 340 (emphasis supplied). Because the two opinions are impossible to reconcile, however, we must narrow the holding to that subscribed to by both Justices White and Black.

arbitration award.[4] To do otherwise would be to render this efficient means of dispute resolution ineffective in many commercial settings.

■ On the other hand, we must not abjure our responsibility to maintain the integrity of the federal courts' role in affirming or vacating awards. Much has been made of the private, noncoercive nature of arbitration, and properly so. Nevertheless, the statutory scheme we examine today implicates the process of the federal courts in the enforcement of "private" remedies. Were we to lend our imprimatur to an award grounded in fraud or bias, the sense of fairness that society rightfully demands of its judiciary would be sadly diminished. For this reason, we cannot countenance the promulgation of a standard for partiality as insurmountable as "proof of actual bias"—as the literal words of Section 10 might suggest. Bias is always difficult, and indeed often impossible, to "prove." Unless an arbitrator publicly announces his partiality, or is overheard in a moment of private admission, it is difficult to imagine how "proof" would be obtained. Such a standard, we fear, occasionally would require that we enforce awards in situations that are clearly repugnant to our sense of fairness, yet do not yield "proof" of anything.

If the standard of "appearance of bias" is too low for the invocation of Section 10, and "proof of actual bias" too high, with what are we left? Profoundly aware of the competing forces that have already been discussed, we hold that "evident partiality" within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.

In assessing a given relationship, courts must remain cognizant of peculiar commercial practices and factual variances. Thus, the small size and population of an industry might require a relaxation of judicial scrutiny, while a totally unnecessary relationship between arbitrator and party may heighten it. In this way, we believe that the courts may refrain from threatening the valuable role of private arbitration in the settlement of commercial disputes, and at the same time uphold their responsibility to ensure that fair treatment is afforded those who come before them.

In light of the foregoing, we examine the particular relationship at issue—namely, a father-son relationship between an arbitrator and the President of an international labor union, a district union of which is a party to the arbitration. The union claims, quite correctly, that there is no authority for a finding of "evident partiality" in such a relationship. We believe, however, the simple reason for this lack of precedent is that arbitrators in similar situations have disqualified themselves rather than risk a charge of partiality.

■ We know nothing more about the relationship between Patrick Campbell, Jr. and Patrick Campbell, Sr. except that the former is the latter's son. We do not know how close they are, or how independent the son is of the father, or how divergent their views on the issues giving rise to the arbitrated dispute. And without knowing more, we are bound by our strong feeling that sons are more often than not loyal to their fathers, partial to their fathers, and biased on behalf of their fathers. We cannot in good conscience allow the entering of an award grounded in what we perceive to be such unfairness.[5]

---

**4.** It is interesting to note that in at least three districts where court annexed arbitration has been established, rules have been promulgated raising the standards for arbitrators' impartiality to those governing Article III judges. *See* U.S. District Court, District of Connecticut, Rule 28; U.S. District Court, Eastern District of Pennsylvania, Local Rule 49; U.S. District Court, Northern District of California, Temporary Local Rules, Chapter V. Arbitration, Rule 500. In these districts, a filial relationship with an officer of one party would certainly require an arbitrator to disqualify himself.

**5.** The District Union argues that, even if we find "evident partiality" in the relationship between arbitrator and party, Morelite must be held to have waived any objection by its failure to object in a timely fashion. Although it is true that a disgruntled party cannot object after an award has been made, *Cook Industries, Inc. v. C. Itoh & Co.*, 449 F.2d 106 (2d Cir.1971), *cert. denied,* 405

We need not, and do not, attempt to set forth a list of familial or other relationships that will result in the *per se* vacation of an arbitration award, except to suggest that such a list would most likely be very short. We do not intend to hold arbitrators to all the standards of Canon 3. Neither do we intend that unsuccessful parties to arbitration may have awards set aside by seeking out and finding tenuous relationships between the arbitrator and the successful party. We hold only that the uncontested relationship here at issue is such that reasonable people would have to believe it provides strong evidence of partiality by the arbitrator.[6]

Accordingly, we reverse the judgment of the district court and remand with instructions to vacate the award.

U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972), this rule applies only where the party has actual knowledge of the facts that form the basis of the objection, *see Middlesex Mutual Ins. Co. v. Levine,* 675 F.2d 1197 (11th Cir.1982).

The unique facts of this case explain Morelite's claim that it did not know Campbell, Jr. was designated as arbitrator in the Master Collective Bargaining Agreements referred to in the job agreements entered into by Morelite and the District Union. Only after disturbances had occurred at the job sites did the President of the Union contact the President of Morelite and ask him to sign job agreements. Morelite's President was assured that these were merely "pieces of paper" to be shown in the event anyone asked whether union labor was being used. Therefore, although the job agreements incorporated the industry's Master Collective Bargaining Agreement, Morelite never asked for or received a copy of the Master Agreement.

After hearing the evidence at trial, Judge Cannella specifically found that Morelite was unaware of the arbitrator's identity at the time the agreements were executed, and that it raised the issue of Patrick's qualifications as soon as it became aware he was the designated arbitrator. We are not prepared to overturn this finding. A party may, of course, agree to the designation of an arbitrator who is otherwise disqualified for interest. But, we do not believe that Morelite waived its objection.

6. The district court, finding no precedent for vacating an award pursuant to 9 U.S.C. § 10 on the grounds of familial relationship, went on to examine the award itself "to determine whether it demonstrates partiality," and found that it did not. We, however, having found partiality in the relationship, need not examine the merits of the award itself. *See Commonwealth Coatings, supra.*