06-3297-cv
Applied Industrial Materials v. Ovalar Makine Ticaret Ve Sanayi

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: April 18, 2007                    Decided: July 9, 2007)

Docket No. 06-3297-cv

APPLIED INDUSTRIAL MATERIALS CORP.,

*Petitioner-Appellant,*

v.

OVALAR MAKINE TICARET VE SANAYI, A.S. and
URAL ATAMAN, his wholly owned or partially owned subsidiaries,

*Respondents-Appellees.*

Before:        WALKER, STRAUB, AND B.D. PARKER, *Circuit Judges.*

Appeal from an opinion and order of the district court denying petitioner's motion to confirm an arbitration award and granting respondents' motion to vacate the arbitration award. AFFIRMED.

DANIEL GOLDMAN (Jonathan Choa, *on the brief*), Paul Hastings, Janofsky & Walker, LLP, New York, NY, Anthony J. Mavronicolas, New York, NY, *for Petitioner-Appellant Applied Industrial Materials Corp.*

JEFFREY L. KESSLER, (David G. Feher, *on the brief*), Dewey Ballantine LLP, New York, NY, *for Respondents-Appellees Ovalar Makine Ticaret Ve Sanayi, A.S. and Ural Ataman.*

BARRINGTON D. PARKER, *Circuit Judge*:

Applied Industrial Materials Corporation ("AIMCOR") appeals from a judgment of the United States District Court for the Southern District of New York (Patterson, *J.*) denying its petition to confirm an arbitration award and granting appellees' motion to vacate it. In the underlying arbitration, Ovalar Makine Ticaret Ve Sanayi, A.S. ("Ovalar"), a Turkish corporation, and Ural Ataman, its chairman, were found liable to AIMCOR for having breached a contract to deliver petroleum coke. We agree with the district court that one of the three arbitrators, whose vote was dispositive, acted with "evident partiality" by failing to either investigate what he knew to be a potential business relationship between his corporation and one of the parties or inform them that he had walled himself off from learning more. *See* 9 U.S.C. § 10(a).

**BACKGROUND**

In 1992, AIMCOR and Ovalar entered into a joint venture in which AIMCOR purchased and transported petroleum coke (a chemical created during oil refinery) to Ovalar, which then distributed the coke in Turkey. The contract provided that any disputes would be settled by arbitration in New York.

In 1997, a dispute arose over the distribution of profits under the joint venture, and the parties resorted to arbitration. The arbitration agreement provided that each party would select an arbitrator, and the two party-appointed arbitrators would then select a third, presiding arbitrator. Section 3 of the agreement provided:

> Prior to the first hearing or initial submissions, all the arbitrators are required to disclose any circumstance which could impair their ability to render an unbiased award based solely upon an objective and impartial consideration of the evidence presented to the Panel . . . .

2

No arbitrator shall accept an appointment or sit on a Panel, where the arbitrator or the arbitrator's current employer has a direct or indirect interest in the outcome of the arbitration.

All such disclosed relationships, experience and/or interests must be objected to by the parties at or before the first procedural hearing, or they shall be deemed waived as creating a bias, prejudice or conflict of interest which would warrant overturning the final award in this matter.

Although the agreement did not specifically address whether the arbitrators were required to make additional disclosures after commencement of the arbitration, section 4 provided that "[n]o person shall *serve* as an arbitrator who has or has had a financial or personal interest in the outcome of the arbitration or who has acquired from an interested source detailed prior knowledge of the matter in dispute." (emphasis added).

Ovalar and AIMCOR each selected one arbitrator, and the parties selected Charles Fabrikant as the third arbitrator and chairman of the panel. He was the Chairman, President and CEO of Seacor Holdings, a multi-billion dollar company with 50 offices in 30 countries.

On September 3, 2003, before the hearings started, the arbitrators were advised that AIMCOR was being sold to Oxbow Industries and that the transaction might be "relevant to the disclosure issue." Each arbitrator submitted a disclosure statement. Fabrikant's statement, dated September 25, 3003, indicated that he "ha[d] had no personal or business relationship with any of the parties to this proceeding, or their affiliates," and would "reserve the right to amend or add to this disclosure should future circumstances warrant it."

At a hearing on March 4, 2005, the parties agreed to bifurcate the arbitration proceedings into liability and damage phases. The liability phase commenced soon thereafter. On April 16, 2005 Fabrikant sent an email to the parties:

Gentlemen: it came to my attention yesterday, or day before yesterday that my St. Louis office, which runs our barge operation under the name SCF, has recently been engaged with Ox-Bow of Palm Beach. The subject of conversation is a contract for the carriage of petroleum coke. I had no knowledge of such conversations taking place prior to the past week. I do not participate in contract negotiations or get involved in day to day operations of SCF.

I would like to amend my prior disclosures. At that time I did ask if there had been contacts between my group and these parties and there were none.

I do not plan to become involved in discussions between SCF and Ox-Bow, should there be further conversations between them.

I do not feel my ability to decide this case on the merits is impaired.

There were no further disclosures or reactions from the parties before the arbitration panel's decision on liability five months later on September 22, 2005. The panel, in a 2-1 decision in which Fabrikant cast the deciding vote, found Ovalar liable to AIMCOR for breach of contract. Following its loss, Ovalar secured new counsel.

Two months later, on November 21, 2005, with the issue of damages still to be decided, Ovalar's counsel wrote to Fabrikant asking him to withdraw. Since the time of the liability award, Ovalar had conducted an investigation and concluded that a previously existing, inadequately disclosed commercial relationship existed between SCF, a division of Fabrikant's company, and Oxbow, the parent of AIMCOR. Ovalar's claim was that since 2004 – well before the liability award – SCF had been transporting petroleum coke for Oxbow, and that this relationship generated approximately $275,000 in revenue.

On December 5, 2005, Fabrikant responded to Ovalar's request, stating that "I see no reason to withdraw from the panel." He revealed that when he was initially informed that SCF was engaged in discussions with Oxbow, he told SCF's president that he "wished to know

4

nothing about SCF's conversations, or be a party to information about our activities with Oxbow or be consulted concerning any business with them." Having erected a so-called "Chinese wall" to prevent his learning of any agreements between his company and Oxbow, Fabrikant concluded that he was unaware of the relationship until he received the letter from Ovalar.

In February 2006, when AIMCOR moved to confirm the partial arbitration award, Ovalar and Ataman moved to vacate the award on the grounds that Fabrikant's failure to recuse himself violated the Federal Arbitration Act, 9 U.S.C. § 10(a). The district court agreed with Ovalar and Ataman. The court's decision focused on several things, including (1) the disclosure requirements in the arbitration agreement, (2) Fabrikant's initial statement that, subject to later clarification, no conflict existed, (3) and Fabrikant's later disclosure that talks were occurring between Oxbow and SCF but that he did not know about them or intend to get involved. The court found that these events gave rise to a reasonable expectation on the part of the parties that they would be notified of any contractual relationship between Seacor and Oxbow. The court held that by insulating himself from learning about any such relationship, and failing to tell the parties that he had done so, Fabrikant created an "appearance of partiality" when a nontrivial commercial relationship surfaced that pre-existed the April 2005 email.

Citing the standards of the American Arbitration Code of Ethics for Arbitrators and the International Bar Association's Guidelines on Conflicts of Interest in International Arbitration, the district court found that "[r]eason dictates that there must be a continuous obligation on the part of the arbitrator to avoid partiality or the appearance of partiality." The court observed that the arbitrator's "failure to investigate the status of SCF's negotiations with Oxbow and his subsequent lack of knowledge do not excuse his lack of disclosure." Accordingly, the district

5

court vacated the award. This appeal followed.

## DISCUSSION

When reviewing a district court's decision to vacate an arbitration award, we review findings of fact for clear error and questions of law *de novo. See Wackenhut Corp. v. Amalgamated Local 515,* 126 F.3d 29, 31 (2d Cir. 1997).

The Federal Arbitration Act, 9 U.S.C. § 10(a), provides that:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration –
> > (1) where the award was procured by corruption, fraud, or undue means; [or]
> > (2) where there was evident partiality or corruption in the arbitrators, or either of them; . . . .

The Supreme Court addressed the meaning of "evident partiality" under § 10(a)(2) in *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145 (1968), and concluded that it existed when one of the parties was a regular, though sporadic, customer of an arbitrator, who failed to disclose that fact. *Id.* at 146-48. There, although there was no evidence of actual bias on the part of the arbitrator, Justice Black, writing for a plurality of the Court, stated that, "[w]e can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." *Id.* at 149. Justice Black imported this rigorous standard from those safeguarding the impartiality of Article III judges. *See id.* He further concluded that when the parties have the relevant information at their disposal, it is up to them to decide whether a conflict is significant enough to warrant an objection. *Id.*

6

Justice White, concurring, underscored the importance of disclosing conflicts at the outset of an arbitration. He also emphasized that federal courts ought not to hold arbitrators to the strict impartiality standards applicable to Article III judges: "it is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed." *Id.* at 151-52 (White, *J.*, concurring). He concluded that "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial." *Id.* at 150.

In *Morelite Construction Corp. v. New York City District Council Carpenter Benefit Funds*, 748 F.2d 79 (2d Cir. 1984) ("*Morelite*"), we concluded that the fractured court in *Commonwealth Coatings* and our precedent provided us "with little guidance concerning what standard is to be applied in construing the 'evident partiality' language of the statute. *See Morelite*, 748 F.2d at 83. We held that a father-son relationship between an arbitrator and an officer of one party to the arbitration rose to the level of "evident partiality." *Id.* at 84. Noting that in *Commonwealth Coatings* Justice Black did not speak for a majority of the Court*,* we elected to followed Justice White's reasoning that arbitrators are not subject to the same standards of impartiality as Article III judges. *See id.* at 82-84. Finding "the standard of 'appearance of bias' . . . too low" and "'proof of actual bias' too high," we held "that 'evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the

7

arbitration." *Morelite*, 748 F.2d at 84. Unlike a judge, who can be disqualified "in any proceeding in which his impartiality *might* reasonably be questioned," *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 332-33 (1987) (emphasis added), an arbitrator is disqualified only when a reasonable person, considering all of the circumstances, "would *have* to conclude" that an arbitrator was partial to one side, *Morelite*, 748 F.2d at 84 (emphasis added).

An arbitrator who knows of a material relationship with a party and fails to disclose it meets *Morelite*'s "evident partiality" standard: A reasonable person would have to conclude that an arbitrator who failed to disclose under such circumstances was partial to one side. Here, the court below did not make findings as to the nature and timing of the arbitrator's knowledge of the relationship between SCF and Oxbow. Instead, the district court focused on whether or not there was an "appearance of partiality" on the part of the arbitrator, a standard that we have made clear is too low. *See id*. As a result, we cannot evaluate whether the arbitrator had knowledge of the relationship that would compel a reasonable person to conclude that he was partial. Were this the only issue before us, we would be inclined to remand to the district court for further development of this issue. *See, e.g., United States v. Int'l Bhd. of Teamsters*, 170 F.3d 136, 146-47 (2d Cir. 1999) (remanding for further consideration where the district court applied the wrong standard for disqualification of an arbitrator); *Sanko S.S. Co. v. Cook Indus., Inc.*, 495 F.2d 1260, 1263 (2d Cir. 1973) (remanding for evidentiary hearing on the full nature of the relationships at issue so that the district court could follow the holding of *Commonwealth Coatings*).

However, our analysis does not end there. While the presence of actual knowledge of a conflict can be dispositive of the evident partiality test, the absence of actual knowledge is not. Indeed, in *Morelite*, we did not address the scope of an arbitrator's duty to investigate or disclose potential conflicts of interest. We now conclude that if we are to take seriously Justice White's statement that "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, *or if they are unaware of the facts but the relationship is trivial*," *Commonwealth Coatings*, 393 U.S. at 150 (White, *J.*, concurring) (emphasis added), arbitrators must take steps to ensure that the parties are not misled into believing that no nontrivial conflict exists. It therefore follows that where an arbitrator has reason to believe that a nontrivial conflict of interest might exist, he must (1) investigate the conflict (which may reveal information that must be disclosed under *Commonwealth Coatings*) or (2) disclose his reasons for believing there might be a conflict and his intention not to investigate. *Cf. ANR Coal Co. v. Cogentrix of N.C.*, 173 F.3d 493, 500 n.4 (4th Cir. 1999) ("[I]f an arbitrator fails to investigate facts that come to light after the award, and those facts are not trivial, the aggrieved party may use this information to demonstrate evident partiality . . . ."). *But see Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc.*, 146 F.3d 1309, 1312-13 (11th Cir. 1998) (stating that evident partiality only exists when an arbitrator knows of a potential conflict but fails to disclose it to the parties).

We emphasize that we are *not* creating a free-standing duty to investigate. The mere failure to investigate is not, by itself, sufficient to vacate an arbitration award. But,

9

when an arbitrator knows of a potential conflict, a failure to either investigate or disclose an intention not to investigate is indicative of evident partiality.

Turning once again to *Morelite*, the question before us is whether a reasonable person, looking at an arbitrator's decision not to investigate and his concomitant failure to inform the parties of the "Chinese Wall,"[1] would conclude that evident partiality existed. Here, the arbitrator was under an ongoing obligation to disclose conflicts and had previously assured the parties that he intended to comply with that obligation. Once he learned that a branch of his company was negotiating with Oxbow to enter into a business relationship, he knew, at a minimum, that a potential conflict existed. It is possible that the arbitrator believed in good faith that because the potential transaction involved a subsidiary, would generate revenue that was small in light of the size of his business, and was far removed from his daily concerns, nothing had occurred that would affect his ability to be fair and impartial.

However, as *Commonwealth Coatings* and *Morelite* make clear, subjective good faith is not the test. Once the arbitrator was aware that a nontrivial conflict of interest might exist, the calculus changed. A reasonable observer attempting to assess whether evident partiality existed would, we think, be given pause by a number of significant facts: the arbitrator had a continuing duty to ensure that neither he nor his corporation had "a

---

[1] While we are not prepared to find that a "Chinese Wall" is an inadequate substitute for investigation, we note that it is preferable for the arbitrator to consult the parties before putting a "Chinese Wall" into place, rather than informing the parties after he has chosen that course of action unilaterally.

direct or indirect interest in the outcome of the arbitration." When the arbitrator learned of mere discussions between the two companies, he disclosed that fact alone.[2] Had he investigated the potential conflict, that investigation would have revealed that a relationship between SCF and Oxbow *already existed* and had generated $275,000 in revenue, not a trivial amount. *See Commonwealth Coatings*, 393 U.S. at 148 (finding that the arbitrator's business relationship with one of the parties was significant, even though "[t]he payments received were a very small part of [the arbitrator's] income" (internal quotation marks omitted)); *see also id.* at 151-52 (White, *J.*, concurring) (agreeing that the business relationship was not trivial and that the arbitrator was required to disclose it). Yet the arbitrator failed to investigate those discussions or disclose that he would make no further inquiries. We believe that, given these circumstances, a reasonable person would have to conclude that evident partiality existed.

The standard of disclosure we apply is not an onerous one. Disclosure serves the twin goals of "encourag[ing] conflicts over arbitrators to be dealt with early in the arbitration process and help[ing] limit the availability of collateral attacks on arbitration awards by a disgruntled party." *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 29 (2d Cir. 2004) (internal quotation marks omitted). As Justice White noted in *Commonwealth Coatings,* "it is far better that the relationship [i.e., a potential conflict between an arbitrator

---

[2] Because the arbitrator never disclosed the fact of the SCF-Oxbow contract, petitioner's argument that respondents waived any objection on that basis is without merit. *See Morelite*, 748 F.2d at 84 n.5 ("Although it is true that a disgruntled party cannot object after an award has been made, this rule applies only where the party has actual knowledge of the facts that form the basis of the objection." (internal citations omitted)).

and a party] be disclosed at the outset, . . . than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award." 393 U.S. at 151 (White, *J.*, concurring). It is certainly true that an arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography." *Id.* But the distance between that type of disclosure and what we would require here is sufficiently great to affirm the district court.

## CONCLUSION

The order of the district court denying petitioner's motion to confirm the arbitration award and granting the respondents' motion to vacate the arbitration award is AFFIRMED.