**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NEW REGENCY PRODUCTIONS, INC., a
California Corporation,
            *Petitioner-Appellant,*

        v.

NIPPON HERALD FILMS, INC., a
Japanese Corporation,
            *Respondent-Appellee.*

No. 05-55224

D.C. No.
CV-04-09951-AHM

OPINION

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
February 13, 2007—Pasadena, California

Filed September 4, 2007

Before: Harry Pregerson, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge William A. Fletcher

11357

**COUNSEL**

Howard L. Horwitz, Eric G. Stockel, Kibre & Horwitz, Beverly Hills, California, for the appellant.

Charles N. Shephard, Greenberg, Glusker, Fields, Claman & Machtinger, Los Angeles, California, for the appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

This case arises from the arbitration of a contract dispute between a film production company and a film distribution

company. The district court vacated the arbitration award based on the neutral arbitrator's failure to disclose that during the arbitration, he began work as a senior executive with a company that was negotiating with a production executive of one of the parties to the arbitration to finance and co-produce an important motion picture.

We hold that vacatur by the district court for "evident partiality" of the arbitrator was proper under the Federal Arbitration Act. We conclude that the lack of evidence of the arbitrator's actual knowledge of the ongoing negotiation does not prevent a finding of evident partiality because, under the circumstances of this case, the arbitrator had a duty to investigate possible conflicts resulting from his new employment and to disclose that employment to the parties. We therefore affirm the decision of the district court.

## I. Background

In May 1995, Appellant New Regency and Appellee Nippon Herald entered into an agreement for Nippon Herald to distribute in Japan five films produced by New Regency. In June 2003, Nippon Herald sued New Regency in a Japanese court, alleging that New Regency had violated the distribution agreement by failing to deliver one of the five films, "Crowded Room," and by refusing to pay Nippon Herald money it claimed it was owed under a cross-collateralization provision. Several months later, the parties agreed that Nippon Herald would withdraw its Japanese suit and instead arbitrate its claims through the American Film Marketing Association ("AFMA"), now the International Film and Television Alliance, a motion picture trade organization with its own arbitration rules and panel of arbitrators.

In November 2003, Nippon Herald and New Regency jointly selected William J. Immerman, then a Los Angeles attorney and executive for Crusader Entertainment, from a list of three potential arbitrators provided by the AFMA. During

the selection process, Immerman disclosed that he had previously arbitrated a case where counsel for Nippon Herald, Charles Shephard, represented a party, and had also negotiated deals "with various executives of New Regency prior to their becoming executives at New Regency." On February 23, 2004, after his selection, Immerman further disclosed that an attorney at Shephard's firm had brought suit against Crusader Entertainment and that, although he was not representing Crusader, he would likely be called as a percipient witness.

The arbitration hearing took place on April 27, 28, and 29, and June 1, 2, and 3, 2004. In an order dated July 19, 2004, Immerman decided that Nippon Herald was entitled to return of the $440,000.00 fee it had paid for the undelivered film — a point not disputed by New Regency — plus interest. In addition, Immerman adopted New Regency's interpretation of the cross-collateralization provision and awarded to New Regency a portion of the proceeds of a recoupment pool plus interest, subsequently determined to amount to $2,341,257.00. Immerman's July 19 order was supplemented twice, on October 4, 2004, and November 30, 2004. Immerman's final order was served on the parties on December 3, 2004.

On December 7, 2004, New Regency moved in federal district court to confirm the final arbitration award and enter judgment pursuant to 9 U.S.C. § 9. Nippon Herald cross-moved to vacate the arbitration award on three grounds: (1) Immerman had erroneously applied California rather than Netherlands contract law, thus exceeding his authority as an arbitrator; (2) Immerman had failed to disclose a prior work relationship with New Regency General Counsel and arbitration witness Bill Weiner; and (3) Immerman had failed to disclose that in mid-July 2004, before entry of the July 19 Order, he began his new employment as Senior Vice President and Chief Administrative Officer of the Yari Film Group. When Immerman began work, Yari Film Group was negotiating to finance and co-produce "The Night Watchman," a motion picture developed by New Regency and produced by Alexan-

dra Milchan ("Milchan"). Milchan is a production executive at New Regency. She is the daughter of New Regency's principal owner and Chief Executive Officer, Arnon Milchan.

The district court granted Nippon Herald's motion to vacate the arbitration award on January 14, 2005. It concluded that vacatur was proper because Immerman's failure to disclose his dealings with Yari Film Group created a reasonable impression of partiality. The district court concluded that Immerman's past relation with Weiner did not support vacatur. It declined to reach the question of whether Immerman had exceeded his authority. New Regency timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## II. Choice of Law

Before proceeding to the merits of the vacatur question, we must first decide whether to apply California law or the Federal Arbitration Act ("FAA"). The district court applied California law without discussion, although it indicated that it would reach the same result under the FAA. In their initial briefing to this court, both New Regency and Nippon Herald argued that California law should apply, citing a single District of Hawaii case, *Brown v. Hyatt Corp.*, 128 F. Supp. 2d 697, 700-01 (D. Haw. 2000), for the proposition that the FAA does not apply to postdispute arbitration agreements. However, in supplemental briefing we ordered on this issue the parties now agree that we should apply the FAA.

[1] For three reasons, we agree with the parties that the FAA, not California law, governs this postdispute arbitration agreement. First, the plain language of the coverage provision of the FAA, 9 U.S.C. § 2, unambiguously encompasses both predispute and postdispute arbitration agreements. According to that provision, the FAA covers:

> A written provision in any maritime transaction or a
> contract evidencing a transaction involving com-

merce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, *or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal . . . .*

9 U.S.C. § 2 (emphasis added). Second, we are aware of no appellate or Supreme Court authority holding that postdispute arbitration agreements fall outside the scope of the FAA. Numerous courts have applied the act to such agreements. *See, e.g.*, *Asia Pac. Indus. Corp. v. Rainforest Caf), Inc.*, 380 F.3d 383, 385 (8th Cir. 2004); *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 681-82 (D.C. Cir. 1996); *Sverdrup Corp. v. WHC Constructors, Inc.*, 989 F.2d 148, 149-51 (4th Cir. 1993). Third, we have previously recognized that "there is a strong default presumption that the Federal Arbitration Act, not state law, supplies the rules for arbitration." *Fidelity Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1311 (9th Cir. 2004) (internal quotation marks and alterations omitted); *see also Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269 (9th Cir. 2002). No circumstance exists here that would overcome this presumption.

We therefore review the district court's vacatur decision under the FAA.

### III.  Merits

The FAA provides that a district court "may make an order vacating [an] [arbitration] award upon the application of any party to the arbitration":

(1) where the award was procured by corruption, fraud, or undue means; (2) *where there was evident partiality or corruption in the arbitrators, or either of them*;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a) (emphasis added).

We review a district court's "decision to vacate or confirm an arbitration award" de novo. *Poweragent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004). We review its findings of fact for clear error. *Coutee v. Barington Capital Group, L.P.*, 336 F.3d 1128, 1132 (9th Cir. 2003).

## A.   Failure to Disclose Employment

Nippon Herald contends that vacatur was proper because Immerman's failure to disclose the facts of his employment by Yari Film Group and its negotiations with Milchan to finance and co-produce "The Night Watchman" is sufficient to establish "evident partiality . . . in the arbitrator[ ]." 9 U.S.C. § 10(a)(2). New Regency argues that vacatur was improper because (1) these facts are insufficient to establish evident partiality, and (2) there is no evidence that Immerman had actual knowledge of Yari Film Group's dealings with Milchan.

## 1.   Legal Standard

"Evident partiality" is distinct from actual bias. In *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145 (1968), the Supreme Court held that a party seeking to

vacate an arbitration award for evident partiality need not show that the arbitrator "was actually guilty of fraud or bias in deciding th[e] case." *Id.* at 147. Rather, the arbitrator's failure to "disclose to the parties any dealings that might create an impression of possible bias" is sufficient to support vacatur. *Id.* at 149. The Court found this standard was satisfied where a neutral arbitrator in a dispute between a contractor and subcontractor failed to disclose that he had previously performed consulting work worth about $12,000 for the contractor. Although "there had been no dealings between them for about a year immediately preceding the arbitration," the arbitrator's past relationship with the contractor had included irregular contacts "over a period of four of five years"and had gone "so far as to include the rendering of services on the very projects involved in th[e] lawsuit." *Id.* at 146. While the Court recognized "that arbitrators cannot sever all their ties with the business world," it emphasized that because arbitrators "have completely free rein to decide the law as well as the facts and are not subject to appellate review," courts must "scrupulous[ly]" "safeguard the[ir] impartiality." *Id.* at 148-49.

**[2]** In *Schmitz v. Zilveti*, 20 F.3d 1043 (9th Cir. 1994), we vacated an arbitration award for evident partiality where the arbitrator's law firm had represented the parent company of a party "in at least nineteen cases during a period of 35 years[,] the most recent representation end[ing] approximately 21 months before [the] arbitration was submitted." *Id.* at 1044. We disagreed with the district court's conclusion that evident partiality could not be shown because the arbitrator "was unaware of his law firm's conflict" during the arbitration. *Id.* Based on *Commonwealth Coatings*, we concluded that the legal standard for evident partiality is whether there are "facts showing a 'reasonable impression of partiality.' " *Id.* at 1048. We explained that this legal standard can be satisfied even where an arbitrator is unaware of the facts showing a reasonable impression of partiality because the arbitrator

"may have a duty to investigate independent of [his] . . . duty to disclose." *Id.*

For two reasons, we concluded in *Schmitz* that there was a duty to investigate. First, "parties can expect a lawyer/ arbitrator to investigate and disclose conflicts he has with actual parties to the arbitration." *Id.* Second, the code of the arbitral body, the National Association of Securities Dealers ("NASD"), "require[d] arbitrators to 'make a reasonable effort to inform themselves of any' 'existing or past financial, business, [or] professional . . . . relationships [that they or their employer, partners, or business associates may have] that are likely to affect impartiality or might reasonably create an appearance of partiality or bias.' " *Id.* at 1049 (alterations in original).

We concluded that the lawyer/arbitrator in *Schmitz* failed to discharge his duty to investigate because, although he had run a conflict check on the actual parties to the arbitration, he had failed to run a conflict check on one party's parent company. That check would have revealed the parent company engaged in substantial business with the arbitrator's law firm. *Id.* at 1044, 1049. Given the lawyer/arbitrator's "constructive knowledge and the presence of the conflict," we concluded that his "failure to inform the parties to the arbitration resulted in a reasonable impression of partiality under *Commonwealth Coatings*." *Id.* at 1049.

## 2. Facts Supporting Vacatur

The key facts are largely undisputed. During the arbitrator selection process in November 2003, the AFMA distributed Immerman's resume to the parties. It stated that he was employed as a private attorney "specializing in representing sales agents, independent producers, financiers and distributors and negotiating complex financing deals and acting as production and distribution counsel for his clients and [a]s Executive Vice President of Crusader Entertainment, LLC."

During the selection process, Immerman disclosed that he had previously "negotiated deals in [his] capacity as an attorney with various executives of New Regency prior to their becoming executives at New Regency." After he was selected, Immerman disclosed, on February 23, 2004, that an attorney at the law firm representing Nippon Herald had filed a lawsuit against Crusader Entertainment, a company he had "represented as an attorney" and where he "also serve[d] as an officer of the company." Immerman stated that he was "not representing Crusader Entertainment in the action but in all probability, should the action proceed further, . . . [would] be a percipient witness since [he] did represent Crusader with respect to the negotiation of the agreement that is the basis of the action."

In October 2004, after the conclusion of the arbitration, Immerman testified under oath in an unrelated proceeding that he had been employed by Yari Film Group "[s]ince the middle of July." Immerman described his position at the Yari Film Group as "Senior executive vice president and chief administrative officer." He listed as among his "responsibilities" "oversee[ing] the business affairs and legal department and assist[ing] the production department and also assist[ing] in the general administration of the company." The district court found that Immerman was "employ[ed] with Yari during the pendency of the arbitration, shortly before the issuance of the first decision," and adverted to the possibility that Immerman had "entered into negotiations at a much earlier time."

Yari Film Group is an independent film company that, during the relevant period, financed and distributed about 10 to 15 films per year, a number of these in partnership with other film companies. In late July 2004, industry press reported that Yari Film Group was in negotiations to finance a film, "The Night Watchman," based on a screenplay by the popular crime novelist James Ellroy, and that Spike Lee was in talks to be the director. The film had been developed by New

Regency and would be produced by Alexandra Milchan, a production executive at New Regency. The press release stated that Milchan would produce the film "outside of her deal with Regency Enterprises." In September, "The Night Watchman" was one of sixteen films, in various stages of development, being financed by Yari Film Group. In November, the actor Keanu Reeves was signed to star in "The Night Watchman." Immerman's final arbitration order was served on the parties in early December.

### 3.  Discussion

**[3]** If the facts of Yari Film Group's negotiations for "The Night Watchman" had been known to Immerman prior to the completion of the arbitration, we would have no trouble concluding that his failure to disclose them to the parties would support vacatur of the arbitration award on the ground of evident partiality. Even if Milchan was not directly representing New Regency in negotiations with Yari Film Group, she was an executive for New Regency and the daughter of its principal owner and chief executive officer. Indeed, Immerman himself had considered past negotiations of deals "with various executives of New Regency *prior to their becoming executives at New Regency*" significant enough to disclose them in November 2003, during the arbitrator selection process. (Emphasis added.) "The Night Watchman" was a significant project. Beginning in mid-July, Immerman was a high-level executive at Yari Film Group, responsible, by his own account, for overseeing its business affairs and legal department and assisting its production department. These facts show that Immerman "ha[d] a substantial interest in a firm which [was doing] more than trivial business" closely connected to a party to the arbitration. *See Commonwealth Coatings*, 393 U.S. at 151-52 (White, J., concurring).

**[4]** New Regency argues on appeal that evident partiality cannot be established because the evidence does not establish that Immerman had actual knowledge of the facts he failed to

disclose. This argument is contrary to *Schmitz*, where we held that an arbitrator's lack of actual knowledge of the presence of a conflict does not excuse non-disclosure where the arbitrator had a duty to investigate, and thus had constructive knowledge of, the conflict. 20 F.3d at 1048. While we did not hold in *Schmitz* that arbitrators have a duty to investigate potential conflicts in all cases, we concluded that such a duty did exist where an arbitrator's firm represented the parent corporation of one of the parties and the procedures of the arbitral body required arbitrators to make a reasonable effort to inform themselves of potential conflicts. *Id.* at 1048-49; *cf. Al-Harbi*, 85 F.3d at 682-83 (finding no evident partiality based on fact that, unbeknownst to arbitrator, his "*former* law firm" represented a party to the arbitration on unrelated matters and distinguishing *Schmitz* on the ground that in the present case "the alleged evident partiality arises not from a representation by any firm with which the arbitrator was connected at the time of the arbitration" (emphasis in original)).

**[5]** Other courts of appeals have agreed with our holding in *Schmitz* that evidence of an arbitrator's actual knowledge of undisclosed facts is not always necessary to establish evident partiality. In *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, ___ F.3d ___, No. 06-3297-CV, 2007 WL 1964955 (2d Cir. July 9, 2007), the Second Circuit held that an arbitration award could be vacated for evident partiality where one of three arbitrators, the chairperson, president, and CEO of a "multi-billion dollar company with 50 offices in 30 countries," "fail[ed] to either investigate what he knew to be a potential business relationship between his corporation" and a parent company of a party "or inform them that he had walled himself off from learning more." *Id.* at *1. The court began with the proposition that where "[a]n arbitrator . . . knows of a material relationship with a party and fails to disclose it," "[a] reasonable person would have to conclude" that the arbitrator was evidently partial. *Id.* at *4. But because the record did not show "the nature and timing of the arbitrator's knowledge" of the relationship between his company

and the parent company of the party, the court's analysis did not end there. *Id.* It noted that Justice White had stated in concurrence in *Commonwealth Coatings* that " 'arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, *or if they are unaware of the facts but the relationship is trivial.*' " *Id.* (quoting *Commonwealth Coatings*, 393 U.S. at 150 (White, J., concurring)) (emphasis in original). While declining to impose on arbitrators a "freestanding duty to investigate," the court read Justice White's statement to require that "where an arbitrator has reason to believe that a nontrivial conflict of interest might exist," the arbitrator must either investigate the circumstance or disclose his or her intention not to investigate. *Id.* at *4-5. Otherwise, parties might be "misled into believing that no nontrivial conflict exists." *Id.* at *4.

The Second Circuit in *Applied Industrial Materials* cited the Fourth Circuit's opinion in *ANR Coal Co., v. Cogentrix of North Carolina, Inc.*, 173 F.3d 493 (4th Cir. 1999). There the court stated that "if an arbitrator fails to investigate facts that come to light after the award, and those facts are not trivial, the aggrieved party may use this information to demonstrate evident partiality under 9 U.S.C. § 10(a)(2)." *Id.* at 499 n.4. The court declined to recognize that an arbitrator has a general duty to investigate, but suggested that should the arbitrator fail to perform due diligence in identifying conflicts, an undiscovered, "not trivial" conflict may result in vacatur. *Id.*

In *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157 (8th Cir. 1995), the Eighth Circuit reversed the district court's order confirming an arbitration award because the arbitrator had failed to disclose his job title and that his employer had "ongoing business relationships" with one of the parties. *Id.* at 158. Although the arbitrator "was not personally involved in" those relationships, the court wrote that "as a high ranking officer," he had "a substantial interest" in his firm, which "did more than trivial business" with the

party. *Id.* at 159. The court did not discuss whether the arbitrator had any actual knowledge of his firm's dealings with the party.

We are aware of only one court of appeals that has adopted a per se rule that a finding of evident partiality is precluded by an arbitrator's lack of "actual knowledge of the information upon which [an] alleged 'conflict' was founded." *Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc.*, 146 F.3d 1309, 1313 (11th Cir. 1998). In *Gianelli*, the Eleventh Circuit disapproved of our decision in *Schmitz.* But even if we were persuaded that *Schmitz* was wrongly decided, we would be bound to follow it as the law of our circuit.

**[6]** For a number of reasons we conclude, in the circumstances of this case, that Immerman had a duty to investigate potential conflicts when he accepted a high-level executive position at Yari Film Group while the arbitration was ongoing. First, the parties could reasonably have expected Immerman to investigate potential conflicts when, during the pendency of the arbitration, he took a job, the duties of which included overseeing the legal department of another film company. *Schmitz*, 20 F.3d at 1048. We believe that his decision to accept a new high-level executive job at a company in the same industry as the parties during the arbitration is precisely the type of situation "where an arbitrator has reason to believe that a nontrivial conflict of interest might exist" and should investigate to determine the existence of potential conflicts. *See Applied Indus. Materials Corp.*, ___ F.3d at ___, 2007 WL 1964955 at *4.

**[7]** Second, the disclosure provisions of the AFMA's arbitral rules impose on Immerman a duty to investigate and disclose conflicts. *See Schmitz*, 20 F.3d at 1049. Section 6.5 of the *AFMA Rules for International Arbitration* (2002) provides that "[a] prospective arbitrator shall disclose to the Arbitral Agent and the parties in connection with such arbitrator's possible appointment as arbitrator any circumstances likely to

give rise to justifiable doubt as to the arbitrator's impartiality or independence as to the parties or the matter in dispute in accordance with the procedural law of the jurisdiction of the place of the arbitration, or, if none is specified, then the laws of the State of California." California Code of Civil Procedure § 1297.121 requires arbitrators in international arbitrations, *see id.* §§ 1297.11, 1297.13, to "make a disclosure to the parties of any information which might cause their impartiality to be questioned." This obligation is ongoing "[f]rom the time of appointment and throughout the arbitral proceedings." *Id.* § 1297.123. While this language does not "expressly provide[ ] that the arbitrator must 'investigate' whether he has any of the questionable relationships and/or interests, . . . [it] necessarily implicates a duty to investigate whether instances of potential conflict exist." *HSMV Corp. v. ADI Ltd.*, 72 F. Supp. 2d 1122, 1129 (C.D. Cal. 1999), *disapproved on other grounds in Fidelity Fed. Bank*, 386 F.3d at 1313.

We also note that Canon I(C) of the *American Arbitration Association and American Bar Association Code of Ethics for Arbitrators in Commercial Disputes* (2004) states that "[a]fter accepting appointment and while serving as an arbitrator, a person should avoid entering into any business, professional, or personal relationship, or acquiring any financial or personal interest, which is likely to affect impartiality or which might reasonably create the appearance of partiality." Canon II(B) of the code also provides that arbitrators have an ongoing duty to "make a reasonable effort to inform themselves of any interests or relationships" subject to disclosure. General Standard 7(c) of the *International Bar Association Guidelines on Conflicts of Interest in International Arbitration* (2004) states that "[a]n arbitrator is under a duty to make reasonable enquiries to investigate any potential conflict of interest, as well as any facts or circumstances that may cause his or her impartiality or independence to be questioned." The standard continues: "Failure to disclose a potential conflict is not excused by lack of knowledge if the arbitrator makes no reasonable attempt to investigate."

Although these sources are not binding authority and do not have the force of law, when considered along with an attorney's traditional duty to avoid conflicts of interest, they reinforce our holding in *Schmitz* that "a reasonable impression of partiality can form when an actual conflict of interest exists and the lawyer has constructive knowledge of it. That the lawyer forgot to run a conflict check . . . is not an excuse." 20 F.3d at 1048 (citations omitted); *see also Commonwealth Coatings*, 393 U.S. at 149 (treating the AAA rules as persuasive authority).

**[8]** Third, the parties could have reasonably expected Immerman to disclose his new employment at Yari Film Group based on his prior pattern of conduct in the arbitration. As New Regency itself noted in its response to Nippon Herald's petition to vacate the award at the district court, in addition to disclosing that he had negotiated deals with executives of New Regency prior to their becoming executives there, "[t]he Arbitrator also provided a detailed biography with a comprehensive employment history." New Regency used these disclosures to argue that vacatur was improper because the arbitrator's disclosure of his past employment history and business dealings placed the onus on Nippon Herald to make further inquiries. Yet it is not reasonable to expect Nippon Herald to investigate potential conflicts with Yari Film Group when Immerman never revealed he had taken a high-level executive job at that company. In fact, it is precisely against the background of previously disclosed information that Immerman's failure to disclose his new position might have "misled" Nippon Herald "into believing that no nontrivial conflict exist[ed]." *Applied Indus. Materials Corp.*, ___ F.3d at ___, 2007 WL 1964955, at *4.

**[9]** Under these circumstances, Immerman had a duty when he accepted the new job at Yari Film Group to investigate the possible conflicts that might arise from his new employment. However, even though Immerman breached his duty to investigate, vacatur is only appropriate if the conflict left undis-

closed was real, *see Schmitz*, 20 F.3d at 1049, and "not trivial." *ANR Coal Co., Inc.*, 173 F.3d at 499 n.4. Understandably, courts have rejected claims of evident partiality based on long past, attenuated, or insubstantial connections between a party and an arbitrator. *See, e.g.*, *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278, 284 (5th Cir. 2007) (en banc) (collecting cases). As Justice White explained in his concurrence in *Commonwealth Coatings*, it would be unrealistic to expect an arbitrator to "provide the parties with his complete and unexpurgated business biography." *Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring).

**[10]** The conflict alleged by Nippon Herald is real and non-trivial. "The Night Watchman" negotiation was not distant in time, but rather ongoing during the arbitration. Nor was the connection between Yari Film Group and New Regency attenuated. Even if Milchan was not directly representing New Regency in the negotiations, she had substantial ties to the company as an executive of the company and the daughter of its principal owner and chief executive officer. Although the record does not allow us to place a dollar value on "The Night Watchman," taking into account the high-profile nature of the film project itself, and the size of Yari Film Group's business, we cannot conclude that the negotiation was unimportant to Yari Film Group.

**[11]** Under these circumstances, we hold that Immerman had a duty, when he accepted the new job at Yari Film Group during the arbitration, to investigate the possible conflicts that might arise from his new employment. We hold further, in light of that duty, that Immerman's failure to disclose facts that show a reasonable impression of partiality is sufficient to support vacatur, notwithstanding the lack of evidence of his actual knowledge of those facts.

While we are cognizant of the public interest in efficient and final arbitration, we believe that a rule encouraging "arbi-

trators [to] err on the side of disclosure" is consistent with that interest. *Id.* at 152. As Justice White explained in *Commonwealth Coatings*, the "arbitration process functions best" where early and full arbitrator disclosure fosters "an amicable and trusting atmosphere" conducive to "voluntary compliance with the decree." *Id.* at 151.

## Conclusion

For the foregoing reasons, we hold that the district court did not err in vacating the arbitration award on the ground of evident partiality.

AFFIRMED.