**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ZEV LAGSTEIN, M.D.,
                *Plaintiff-Appellant,*

v.

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                *Defendant-Appellee.*

No. 07-16094

D.C. No.
CV-03-01075 RCJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted
November 3, 2009—San Francisco, California

Filed June 10, 2010

Before: Betty B. Fletcher, William C. Canby, Jr., and
Susan P. Graber, Circuit Judges.

Opinion by Judge Canby

8487

**COUNSEL**

Thomas L. Hudson, Osborn Maledon, P.A., Phoenix, Arizona, for the plaintiff-appellant.

Evan M. Tager, Mayer Brown LLP, Washington, D.C., for the defendant-appellee.

**OPINION**

CANBY, Circuit Judge:

After developing heart disease and other ailments, Zev Lagstein, M.D., filed with Certain Underwriters at Lloyd's, London ("Lloyd's") a claim for benefits under a disability policy. After nearly two years passed without a decision on the claim, Lagstein sued Lloyd's in federal court. The case was stayed pending binding arbitration mandated by Lagstein's policy. The majority of a three-member arbitration panel found in favor of Lagstein, awarding him full policy benefits, emotional distress damages, and punitive damages, all of which totaled more than six million dollars. The district court vacated the overall award on the ground of its excessive size and vacated the punitive damages award on the additional ground that the arbitration panel lacked jurisdiction to enter it after the panel had entered its compensatory award. We reverse the district court's vacatur of the awards. We agree, however, with the district court's ruling that Lloyd's did not establish partiality of two of the arbitrators as an additional ground of vacatur.

**BACKGROUND**

Appellant Lagstein is a cardiologist and disability examiner. In 1999, he obtained an insurance policy from Appellee Lloyd's in which Lloyd's agreed to pay Lagstein $15,000 per month for up to sixty months in the event that Lagstein became unable to practice medicine due to disability. In 2001, Lagstein developed heart disease, as well as severe migraine headaches and other neurological problems. Several physicians who examined Lagstein concluded that he was permanently disabled from practicing medicine. Lagstein then submitted to Lloyd's a claim for benefits under the disability policy.

Because Lagstein had received no benefits or even a decision on his claim by early 2002, he went back to work against the advice of his doctors. Relations between the parties increasingly soured, and each accuses the other of delay and bad faith in the months that followed. In September 2003, still having received no decision on his claim,[1] Lagstein filed a complaint in the United States District Court for the District of Nevada for breach of contract, breach of the covenant of good faith and fair dealing, and unfair trade practices. Upon Lloyd's motion, the district court stayed the lawsuit pending binding arbitration required by Lagstein's policy.

As provided in Lagstein's policy, each party appointed an arbitrator and those two arbitrators appointed a third. Lagstein selected Jerry Carr Whitehead, Lloyd's selected Ralph O. Williams, III, and Whitehead and Williams together appointed Charles Springer. Each of the arbitrators submitted a disclosure statement to the parties setting forth prior relationships with the parties, the parties' attorneys, and those attorneys' law firms.

---

[1]Lloyd's finally denied Lagstein's claim on July 29, 2005, approximately three and a half years after the claim was filed.

The initial arbitration hearing was held from July 11 to July 14, 2006, and the panel issued a decision on August 31, 2006. All three arbitrators concluded that Lloyd's breached the insurance contract and acted unreasonably, but the panel split on the amount of damages to be awarded. The majority, formed by Springer and Whitehead, concluded that Lagstein should be awarded the full value of his policy, $900,000, as well as $1,500,000 for emotional distress. The majority also concluded that punitive damages were warranted, but ordered that the amount be determined at a separate hearing.

The dissenting arbitrator, Williams, would have awarded Lagstein only $11,000 under his policy and no emotional distress damages or punitive damages. The disagreement between the majority and the dissent turned on whether the evidence showed that Lagstein remained disabled from practicing medicine after he returned to work, whether Lagstein proffered sufficient evidence of emotional distress, and the significance of delays in Lloyd's handling of the claim that were attributable to Lagstein himself.

The punitive damages hearing was held on November 20 and 21, 2006, over Lloyd's objection that the panel's jurisdiction had ended once it issued the initial award. The same majority of the panel, after explaining the basis for its continued jurisdiction, awarded Lagstein $4,000,000 in punitive damages. Arbitrator Williams again dissented, arguing that the panel lacked jurisdiction to make the award, and that, even if it had jurisdiction, the award appropriately should have been $50,000.

Following the panel's initial award, Lloyd's investigated the backgrounds of arbitrators Springer and Whitehead and discovered their roles in a controversy that had occurred over a decade earlier. In 1993, Whitehead, who at the time was a Nevada trial judge, became involved in an ethics controversy arising from his handling of peremptory strikes entered against him under Nevada's rule for peremptory striking of

judges. The Nevada Commission on Judicial Discipline filed a complaint alleging that on several occasions Whitehead, through *ex parte* contacts, permitted counsel for the non-challenging party to select a replacement judge. Although the Commission's complaint against Whitehead eventually was dropped, the FBI subsequently investigated Whitehead on unspecified charges. Whitehead ultimately signed a non-prosecution agreement conditioned on his retiring from the bench, agreeing not to seek reelection, and agreeing not to serve again in "any state judicial capacity."

In the meantime, a related controversy erupted over the Commission's procedures and jurisdiction in the Whitehead investigation. These matters were addressed by an increasingly divided Nevada Supreme Court over the course of several decisions.[2] Arbitrator Springer was a member of the Nevada Supreme Court at the time and consistently sided with Whitehead on these procedural and jurisdictional issues. *See, e.g.*, *Whitehead IV*, 893 P.2d at 941-65 (Springer, J., concurring).

Lloyd's filed in the district court a motion to vacate the arbitration awards on several grounds, including Springer's and Whitehead's failure to disclose the prior ethics controversy, as well as the majority's decision to hold a separate punitive damages hearing after the issuance of the initial award. Following a hearing on the matter, the district court vacated the awards, concluding that the size of the awards was excessive and in manifest disregard of the law, and that

---

[2]*See Whitehead v. Nev. Comm'n on Judicial Discipline*, 869 P.2d 795 (Nev. 1994), *amended by* 906 P.2d 230 (Nev. 1994) ("*Whitehead I*"); *Whitehead v. Nev. Comm'n on Judicial Discipline*, 873 P.2d 946 (Nev. 1994) ("*Whitehead II*"); *Whitehead v. Nev. Comm'n on Judicial Discipline*, 878 P.2d 913 (Nev. 1994) ("*Whitehead III*"); *Whitehead v. Nev. Comm'n on Judicial Discipline*, 893 P.2d 866 (Nev. 1995) ("*Whitehead IV*"); *Whitehead v. Nev. Comm'n on Judicial Discipline*, 908 P.2d 219 (Nev. 1995) ("*Whitehead V*"); *Whitehead v. Nev. Comm'n on Judicial Discipline*, 920 P.2d 491 (Nev. 1996) ("*Whitehead VI*").

the punitive damages award contravened public policy and exceeded the panel's jurisdiction. The district court concluded, however, that vacatur was not independently warranted by Springer's and Whitehead's non-disclosure of the prior controversy.

Lagstein appeals the district court's vacatur of the arbitration awards. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## DISCUSSION

[1] We review de novo the district court's vacatur of an arbitration award. *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1105 (9th Cir. 2007). "Our review is limited by the Federal Arbitration Act ('FAA'), which 'enumerates limited grounds on which a federal court may vacate, modify, or correct an arbitral award.' " *Bosack v. Soward*, 586 F.3d 1096, 1102 (9th Cir. 2009) (quoting *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc)), *cert. denied*, 130 S. Ct. 1522 (2010). Section 10(a) of the FAA permits a district court to vacate an arbitration award under only four circumstances:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final,

and definite award upon the subject matter submitted
was not made.

9 U.S.C. § 10(a). Unless the award is vacated as provided in
§ 10, or modified as provided in § 11 (not in issue here),[3]
"confirmation is required even in the face of erroneous find-
ings of fact or misinterpretations of law." *Kyocera*, 341 F.3d
at 997 (citation and internal quotation marks omitted); *see
Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584
(2008) (holding that §§ 10 and 11 "provide the FAA's exclu-
sive grounds for expedited vacatur and modification").

## A

The district court's first ground for vacating the arbitration
awards was the awards' total size. As the district court
explained, the amount of the awards "shock[ed] the Court's
conscience," suggested bias, was unsupported by the record,
manifestly disregarded the law, and contravened public pol-
icy. Lagstein argues that none of these reasons justified the
awards' vacatur. We agree.

[2] A district court may not vacate an arbitration award
simply because the court disagrees with its size. The heart of
such disagreement concerns the panel's weighing of the evi-
dence, here, on matters such as the length and severity of Lag-
stein's disability and the egregiousness of Lloyd's conduct.
But § 10 of the FAA "does not sanction judicial review of the
merits," *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th
Cir. 2007), and "[w]hether or not the panel's findings are sup-
ported by the evidence in the record is beyond the scope of
our review," *Bosack*, 586 F.3d at 1105. Thus, it was error for

---

[3]Section 11 provides that a court may modify or correct an award when
(a) there is an evident miscalculation of figures or mistake in description;
(b) the arbitrators have awarded on a matter not submitted to them; or (c)
the award is imperfect in a matter of form not affecting the merits of the
controversy. 9 U.S.C. § 11. Neither party here has invoked § 11.

the district court to vacate the arbitration awards simply because it found the total size either shocking or unsupported by the record.[4]

**[3]** Nonetheless, Lloyd's argues that vacatur was proper because the arbitration awards manifestly disregarded the law and were completely irrational. Section 10 permits vacatur "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). This is a high standard for vacatur; "[i]t is not enough . . . to show that the panel committed an error—or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 (2010). "[A]rbitrators 'exceed their powers' . . . not when they merely interpret or apply the governing law incorrectly, but when the award is 'completely irrational,' or exhibits a 'manifest disregard of law.' " *Kyocera*, 341 F.3d at 997 (citations omitted). We conclude that neither excess occurred in this case.

**[4]** First, the district court erred in concluding that the size of the arbitration awards demonstrated manifest disregard of the law.[5] " 'Manifest disregard of the law' means something

---

[4]We also find that the district court's conclusions that the total size of the award contravened public policy and showed bias are without support. First, we note that mere inconsistency with a court's generalized view of public policy is not an appropriate ground for vacatur of an arbitration award, and Lloyd's does not attempt to defend this basis for vacatur on appeal. *See Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1212-13 (9th Cir. 1989) (en banc) (holding that, to vacate an award on public policy grounds, "[a] court must both delineate an overriding public policy rooted in something more than general considerations of supposed public interests, and, of equal significance, it must demonstrate that the policy is one that specifically militates against the relief ordered by the arbitrator.") (internal quotation marks and citation omitted). Second, although an award may be vacated "where there was evident partiality . . . in the arbitrators," 9 U.S.C. § 10(a)(2), the district court concluded that Lloyd's failed to show that the arbitrators were partial to Lagstein. Thus, the district court's statement that the award "is biased" is puzzling.

[5]In *Stolt-Nielsen*, 130 S. Ct. at 1768 n.3, the Supreme Court left open the question whether "manifest disregard" as an independent ground of

more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law." *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995). To vacate an arbitration award on this ground, "[i]t must be clear from the record that the arbitrators recognized the applicable law and then ignored it." *Id.*; *see, e.g.*, *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1293 (9th Cir.), *cert. denied*, 130 S. Ct. 145 (2009). Here, the district court found "manifest disregard of the law" without citing any applicable law that the panel recognized and ignored. Similarly, on appeal, Lloyd's does not cite a single Nevada statute or decision pertinent to the size of the arbitration award that the panel manifestly disregarded.

**[5]** Lloyd's argues, however, that at times "legally dispositive facts are so firmly established that an arbitrator cannot fail to recognize them without manifestly disregarding the law." *Coutee v. Barington Capital Group, L.P.*, 336 F.3d 1128, 1133 (9th Cir. 2003). But the facts of Lagstein's continuing disability were hotly contested. The panel's conclusion that Lagstein remained disabled from the practice of medicine after returning to work is not contrary to firmly established legally dispositive facts. Thus, manifest disregard of the law did not provide a basis for vacating the arbitration award.

**[6]** Lloyd's also attempts to recast the district court's vacatur as an expression that the arbitration awards were "completely irrational." *See, e.g.*, *Kyocera*, 341 F.3d at 997 (citation and quotation marks omitted). An award is completely irrational "only 'where the arbitration decision fails to draw its essence from the agreement.' " *Comedy Club*, 553 F.3d at 1288 (citation and brackets omitted). An arbitration award "draws its essence from the agreement if the award is

---

vacatur survives *Hall Street Associates*, 552 U.S. at 585. Our earlier precedent, however, establishes as the law of our circuit that it does so survive. *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1281 (9th Cir.), *cert. denied*, 130 S. Ct. 145 (2009).

derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions." *Bosack*, 586 F.3d at 1106 (citations and internal quotation marks omitted). Lloyd's, however, defends the vacatur of the award on the ground that the awards were irrational in light of the *facts*. For example, Lloyd's argues that it was irrational for the panel to conclude that Lagstein was totally disabled from practicing medicine when the evidence showed that Lagstein returned to work to complete tasks that he considered "easy." However, "the question is whether the award is 'irrational' with respect to the contract, not whether the panel's findings of fact are correct." *Id.* "Whether or not the panel's findings are supported by the evidence in the record is beyond the scope of our review." *Id.* at 1105.

Further, Lloyd's assertion that the majority misinterpreted certain policy provisions is insufficient to show that the amount of the awards was completely irrational. The fact that the majority may have made a mistake in citing a benefit that Lagstein had not purchased does not establish irrationality of its ultimate conclusion that Lloyd's breached its contract. The majority provided several independent reasons for finding a breach of contract, such as Lloyd's failure to advise Lagstein of the acceptance or denial of his claim within thirty days. This rationale was consistent with applicable Nevada law, *see* Nev. Rev. Stat. § 689A.410, and not inconsistent with the terms of Lagstein's policy.

Equally unavailing is Lloyd's argument that the majority, in concluding that Lloyd's acted in bad faith and repudiated the contract, mistakenly concluded that Lloyd's had violated the policy's "referee provision." This provision required that Lloyd's physician and Lagstein's physician, in the event that they disagreed about whether Lagstein was disabled, choose a third physician to evaluate Lagstein. After such a disagreement arose, Lloyd's hired a third physician of its own choosing to evaluate Lagstein. While Lloyd's claims that the

physician was hired to evaluate an entirely different medical condition, so that the referee provision was inapplicable, the panel majority interpreted the evidence differently, concluding that Lloyd's violated the provision by not informing Lagstein of its applicability. Disagreement over Lloyd's compliance with a policy provision is insufficient to show that the award failed to draw its essence from Lagstein's policy. *See Bosack*, 586 F.3d at 1106 ("We will not vacate an award simply because we might have interpreted the contract differently.").

**[7]** We conclude, therefore, that the district court's vacatur of the overall awards was not supported by any permissible ground under the Arbitration Act or the controlling decisions interpreting it.

**B**

The district court also vacated the punitive damages award on the alternative ground that the panel no longer had jurisdiction over the dispute after issuing the initial arbitration award. We conclude that the panel did not exceed its authority because the timing of the arbitration award was a procedural matter committed to the panel's interpretation, and the panel's conclusion that it retained jurisdiction was a plausible construction of the parties' agreement and the procedural rules the agreement incorporated.

**[8]** Lagstein's policy provided that the arbitration was governed by the commercial arbitration rules of the American Arbitration Association ("AAA"). At issue is Rule R-41, which provides that an award "shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than [thirty] days from the date of closing the hearing." Am. Arbitration Ass'n, *Commercial Arbitration Rules and Mediation Procedures*, Rule R-41 (2005) (hereinafter "CAR"). Upon the close of the initial hearing on July 14, 2006, arbitrator Williams stated that the panel would treat the

matter as submitted. He also noted that, "[u]nder the AAA rules, a decision is required generally within 30 days." Because of scheduling concerns, Williams requested a fifteen-day extension for making an award—until September 1, 2006 —which the parties granted.

**[9]** The panel issued its initial decision on August 31, 2006, awarding compensatory and emotional distress damages. The initial award also specified that a punitive damages hearing would be held at a later date. The parties, however, did not expressly agree to extend the time for making an award past September 1, 2006. Rule R-38 specifies that "the arbitrator may for good cause extend any period of time established by these rules, *except the time for making the award.*" CAR, Rule R-38 (emphasis added). Thus, Lloyd's argues that, by holding the punitive damages hearing and then making an award past September 1, 2006, the panel exceeded its jurisdiction. We conclude that Lloyd's is mistaken.

Section 10 of the FAA permits vacatur "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). A party has "a right to arbitration according to the terms for which it contracted," *W. Employers Ins. Co. v. Jefferies & Co.*, 958 F.2d 258, 261 (9th Cir. 1992), and arbitrators exceed their powers for purposes of § 10(a)(4) when they "act outside the scope of the parties' contractual agreement," *Mich. Mut. Ins.*, 44 F.3d at 830; *see Stolt-Nielsen*, 130 S. Ct. at 1772-75. However, "[w]e . . . have no authority to vacate an award solely because of an alleged error in contract interpretation." *Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1486 (9th Cir. 1991). Instead, "[we] need only determine whether the arbitrators' interpretation was 'plausible.'" *Id.* (citations omitted); *see also McKesson Corp. v. Local 150 IBT*, 969 F.2d 831, 834 (9th Cir. 1992).

**[10]** As a general matter, this narrow standard of review applies to the arbitrator's interpretation of matters of procedure in the contract as well as matters of substance. "In the

absence of an express agreement to the contrary, procedural questions are submitted to the arbitrator, either explicitly or implicitly, along with the merits of the dispute." *McKesson*, 969 F.2d at 834; *cf. Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir. 2006) (explaining that "the arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the merits"). As the Supreme Court has explained, " 'procedural questions which grow out of the dispute and bear on its final disposition' are presumptively not for the judge, but for an arbitrator, to decide." *Stolt-Nielsen*, 130 S. Ct. at 1775 (internal quotation and citation omitted); *see also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 (1987).

**[11]** The question of the time frame within which an arbitration panel may issue an award is a procedural matter. *McKesson*, 969 F.2d at 834 ("Courts have uniformly held that limitations on the time in which an arbitrator may render an award are procedural not jurisdictional.").

**[12]** Nothing in Lagstein's policy or the CAR that it incorporated expressly withdrew determination of procedural issues from the panel. In fact, Rule R-53, which provides that "[t]he arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties," clearly contemplates that arbitrators will decide the meaning of the CAR's procedural rules. CAR, Rule R-53; *see also Gov't of India v. Cargill, Inc. (In re Arbitration No. AAA13-161-0511-85)*, 867 F.2d 130, 134 (2d Cir. 1989) (rejecting a challenge to an arbitration award that was not made within thirty days of the close of hearing because the agreement gave arbitrators authority to interpret the rules).

We also conclude, for two reasons, that the panel plausibly interpreted the arbitration agreement and its governing rules to permit the panel to schedule a hearing beyond September 1, 2006.

**[13]** First, because the initial award specified that further proceedings would be held to decide the amount of punitive damages, the panel plausibly determined that the initial award constituted an interim award.[6] *See* CAR, Rule R-43(b) (permitting the panel to issue "interim, interlocutory, or partial rulings, orders, and awards," in addition to final awards). Thus, because a final award had not issued, the hearing plausibly could have been reopened under Rule R-36, which provides that "[t]he hearing may be reopened on the arbitrator's initiative . . . *at any time before the award is made*." *Id.,* Rule R-36 (emphasis added). Further, while the parties must agree to an extension of time for making the award "[i]f reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen," the panel could have concluded that no such agreement was required in this case. *Id.* The last sentence in Rule R-36 provides that, "[w]*hen no specific date is fixed in the contract*, the arbitrator may reopen the hearing and shall have [thirty] days from the closing of the reopened hearing within which to make an award." *Id.* (emphasis added). Lagstein's policy contained "no specific date" by which a final award must be made, and instead simply provided that the CAR would govern the arbitration. Therefore, the panel did not need the agreement of the parties to reopen the hearing and, because the panel issued the final punitive damages award within thirty days of the punitive damages hearing, Rule R-41 was satisfied.[7]

---

[6]The panel majority pointed out that Nevada law instructs triers of fact first to decide whether punitive damages are warranted and then to hold a subsequent proceeding to determine their amount, *see* Nev. Rev. Stat. § 42.005(3). Although Lloyd's argues that this Nevada bifurcation rule does not apply to arbitration, any misapplication cannot justify vacatur; "such legal . . . errors lie far outside the category of conduct embraced by § 10(a)(4)." *Kyocera Corp.*, 341 F.3d at 1003.

[7]The punitive damages hearing was held on November 21 and 22, 2006, and the award issued on December 14, 2006.

**[14]** Second, the panel plausibly interpreted the CAR rules to conclude that the punitive damages award could be issued later than September 1, 2006, because the dispute was subject to the AAA's Procedures for Large, Complex Commercial Disputes ("PLCCD"). CAR Rule R-1 provides that "[u]nless the parties agree otherwise, the [PLCCD] shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000." *Id.* Rule R-1. Lagstein's complaint alleged that he was owed $900,000 in total disability benefits, plus emotional distress and punitive damages, and there is no record of an agreement between the parties that the PLCCD would not apply. Thus, under the PLCCD, the arbitrators had authority to "take such steps as they . . . deem[ed] necessary or desirable to avoid delay and to achieve a just, speedy and cost-effective resolution." *Id.* Rule L-4. The panel plausibly could have concluded that it would be "necessary or desirable" to determine whether punitive damages were appropriate in the initial award and then hold a separate hearing to determine their amount. To the extent that the application of Rule L-4 conflicted with Rule R-41, Rule L-4 controlled. *See id.,* Rule R-1 (providing that, where the PLCCD apply, other CAR rules apply only to the extent that they do not conflict with PLCCD).

**[15]** Undoubtedly, reasonable judges and arbitrators could interpret the AAA rules differently from the way that the majority did in this case. We stress that "[w]hether we would find [the majority's] arguments convincing were it up to us to interpret the contract is beside the point." *Berklee Coll. of Music v. Berklee Chapter of the Mass. Fed'n of Teachers, Local 4412*, 858 F.2d 31, 34 (1st Cir. 1988) (Breyer, J). Because nothing in the parties' agreement removed the arbitrators' authority to resolve procedural matters, we need only find that the panel's interpretation of the agreement was plausible.[8] Having concluded that this standard was met, we hold

---

[8]Our case is to be distinguished from *Stolt-Nielsen*, in which the arbitration panel developed its own common-law rule to be applied to the parties, which had not agreed to it. *See Stolt-Nielsen*, 130 S. Ct. at 1768-69. Here, the panel reached its procedural decisions by plausibly interpreting the CAR, which Lagstein's policy expressly incorporated.

that the district court erred in vacating the punitive damages award on the ground that the panel exceeded its authority.

## C

In addition to the grounds relied upon by the district court for vacating the awards, Lloyd's argues that vacatur was warranted by arbitrator Whitehead's failure to disclose his and arbitrator Springer's roles in an ethics controversy that occurred in the early 1990s. Lloyd's argues that vacatur was required under § 10(a)(2) of the FAA, which applies "where there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). We agree with the district court, however, that Lloyd's proved neither "an inappropriate relationship or contact between the judges, nor a failure to disclose information that would warrant vacating the award."[9]

**[16]** To show "evident partiality" in an arbitrator, Lloyd's either must establish specific facts indicating actual bias toward or against a party or show that Whitehead failed to disclose to the parties information that creates "[a] reasonable impression of bias." *Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir. 1996); *see also Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145 (1968). The evidence that Lloyd's offers falls short of this standard.

Under the FAA, vacatur of an arbitration award is not required simply because an arbitrator failed to disclose a matter of some interest to a party. Instead, Whitehead was required to disclose only facts indicating that he "might reasonably be thought biased *against one litigant and favorable to another*." *Commonwealth Coatings*, 393 U.S. at 150 (emphasis added); *see also Woods*, 78 F.3d at 427 ("[V]acatur

---

[9]We review de novo the district court's standard for impartiality. *Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir. 1996). "Factual findings underlying the court's decision will be reversed only for clear error." *Id.*

is appropriate where the arbitrator's failure to disclose information gives the impression of bias *in favor of one party.*" (emphasis added)).

**[17]** Lloyd's has failed to show any connection between the parties to this arbitration and any of arbitrator Whitehead's past difficulties that would give rise to a reasonable impression of partiality toward Lagstein.[10] Whitehead's alleged misconduct occurred more than a decade before this arbitration and concerned neither of the parties to this case. *See PaineWebber Group, Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 995 (8th Cir. 1999) (characterizing a claim of evident partiality as "border[ing] on the frivolous" where there was no alleged relationship between the parties and the arbitrators, and "there [was] no evidence the arbitrators had any financial or personal interest in the outcome of the arbitration"). The district court was not required to accept Lloyd's argument that an allegation of past abuse of power necessarily demonstrated likely partiality against Lloyd's in the present case. Indeed, Whitehead disclosed that he had mediated "multiple cases for Lloyd's of London" in his mediation practice.

All three arbitrators in this case discharged their disclosure obligations by providing information concerning their relationships with the parties, their attorneys, and those attorneys' law firms. If Lloyd's desired additional information about the arbitrators' backgrounds, it was free to seek that information by its own efforts.[11] We decline to create a rule that encourages losing parties to challenge arbitration awards on the basis

---

[10]Considering the absence of any connection between this arbitration and the previous controversy, we also conclude that the district court did not clearly err in rejecting Lloyd's argument that, in light of arbitrator Springer's defense of arbitrator Whitehead in the prior controversy, Springer would be unable to remain sufficiently independent in this case to avoid evident corruption or partiality.

[11]We note that details of the Whitehead controversy were publicly available and easily could have been discovered if Lloyd's had conducted even minimal due diligence on the arbitrators' backgrounds.

of pre-existing, publicly available background information on the arbitrators that has nothing to do with the parties to the arbitration. The district court did not clearly err in concluding that Lloyd's failed to show evident partiality.

For similar reasons, there is no merit to Lloyd's claim that the award must be vacated on the ground of "evident . . . corruption." 9 U.S.C. § 10(a)(2). We have not previously been called upon to define "evident corruption," but Lloyd's evidence fails to satisfy any reasonable definition of that term. Its evidence of alleged corruption at some time in the past does not relate to this case or the parties to it, nor does it raise a "reasonable impression of corruption" in the present case.

**[18]** Therefore, because Lloyd's failed to demonstrate either evident partiality or evident corruption in the arbitrators within the meaning of § 10(a)(2), the district court correctly rejected those possible grounds of vacatur.

## CONCLUSION

**[19]** We previously have observed that, "[p]ossibly because the nature of our review in these cases is so unusual, there may be a tendency for judges, often with the most unobjectionable intentions, to exceed the permissible scope of review and to reform awards in [the judge's] own image of the equities or the law." *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1204 (9th Cir. 1989) (en banc). Under the FAA, however, the reform of arbitration awards, including the severe remedy of vacatur, is limited by those grounds established by Congress in the Act. Because we conclude that vacatur in this case was not warranted by any of the grounds permitted by § 10 of the FAA, we reverse the district court's vacatur of the arbitration awards and remand for confirmation of all of the awards.

**REVERSED and REMANDED** with instructions.