**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE MARY ANN SUSSEX; MITCHELL PAE; MALCOLM NICHOLL; SANDY SCALISE; ERNESTO VALDEZ, SR.; ERNESTO VALDEZ, JR.; JOHN HANSON; ELIZABETH HANSON, | No. 14-70158<br><br>D.C. No. 2:08-cv-00773-MMD-PAL |
| MARY ANN SUSSEX; MITCHELL PAE; MALCOLM NICHOLL; SANDY SCALISE; ERNESTO VALDEZ, SR.; ERNESTO VALDEZ, JR.; JOHN HANSON; ELIZABETH HANSON, *Petitioners*,<br><br>v.<br><br>UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA, LAS VEGAS, *Respondent*,<br><br>TURNBERRY/MGM GRAND TOWERS, LLC; MGM GRAND INC., DOING BUSINESS AS MGM MIRAGE; TURNBERRY/HARMON AVE., LLC; MGM GRAND CONDOMINIUMS, LLC; SIGNATURE CONDOMINIUMS, LLC; TURNBERRY WEST REALTY, | ORDER AND AMENDED OPINION |

INC.; MGM RESORTS
INTERNATIONAL,
                *Real Parties in Interest*.

Petition for Writ of Mandamus
to the United States District Court for the District of
Nevada

Argued and Submitted
November 20, 2014—San Francisco, California

Filed January 27, 2015
Amended March 27, 2015

Before: Ferdinand F. Fernandez and Sandra S. Ikuta,
Circuit Judges, and William H. Albritton III, Senior
District Judge.[*]

Order;
Opinion by Judge Ikuta

---

[*] The Honorable William H. Albritton III, Senior District Judge for the
U.S. District Court for the Middle District of Alabama, sitting by
designation.

## SUMMARY[**]

### Writ of Mandamus / Arbitration

The panel granted a writ of mandamus, and directed the district court to vacate its grant of a motion, while arbitration was pending, to disqualify an arbitrator for evident partiality under 9 U.S.C. § 10(a)(2).

Purchasers of condominium units in a luxury condominium project brought civil actions against the developer and seller of the project, and the parties agreed to submit the disputes to arbitration. The district court concluded that it had the authority to intervene in an ongoing arbitration under *Aerojet-General Corp. v. Am. Arbitration Ass'n*, 478 F.2d 248 (9th Cir. 1973), and granted the developer's motion to disqualify the arbitrator.

*Bauman v. U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977), sets forth five factors for determining whether a petitioner has carried the burden of establishing a "clear and indisputable" right to issuance of a writ of mandamus, including factor three – whether the district court's order was clear error.

The panel determined that the district court clearly erred in holding that its decision to intervene mid-arbitration was justified under *Aerojet-General*. Specifically, the panel held that the district court erred in predicting that an award issued by the arbitrator would likely be vacated because of his "evident partiality" under 9 U.S.C. § 10(a)(2). The panel also

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that even if the arbitrator's activities created a reasonable impression of partiality, the district court's equitable concern that delays and expenses would result if an arbitration award were vacated was manifestly inadequate to justify a mid-arbitration intervention, regardless of the size and early stage of the arbitration.

The panel applied the remaining factors set forth in *Bauman*, and concluded that they weighed in favor of granting the extraordinary remedy of mandamus relief.

---

### COUNSEL

Norman B. Blumenthal (argued) and Kyle Nordrehaug, Blumenthal, Nordrehaug & Bhowmik, La Jolla, California; Robert Gerard, Gerard & Associates, Las Vegas, Nevada, for Petitioners.

Steve Morris (argued), Akke Levin, and Jean-Paul Hendricks, Morris Law Group, Las Vegas, Nevada; Alex Fugazzi and Justin Carley, Snell & Wilmer LLP, Las Vegas, Nevada, for Real Party in Interest Turnberry/MGM Grand Towers, LLC.

Yvette Ostolaza, Yolanda C. Garcia, and Robert Velevis, Sidley Austin LLP, Dallas, Texas, for Real Party in Interest MGM Resorts International.

No appearance for Respondent.

---

## ORDER

The opinion filed on January 27, 2015, and published at 776 F.3d 1092, is hereby amended as follows:

On page 1099, the first sentence of the final paragraph should be deleted and replaced with the following:

> The majority of our sister circuits expressly preclude any mid-arbitration intervention.

On page 1100, the following should be added to the end of the paragraph continued from page 1099:

> However, we need not address the precise scope of the *Aerojet-General* exception because, as we discuss in the next section, this is clearly not an "extreme case" in which mid-arbitration intervention could be justified.

On page 1102, in the penultimate paragraph, the phrase "*Aerojet-General*'s dicta" should be replaced with "*Aerojet-General*".

With these amendments, the petition for panel rehearing is **DENIED**. Judge Ikuta voted to deny the petition for rehearing en banc and Judge Fernandez and Judge Albritton so recommended. The petition for rehearing en banc was circulated to the judges of the court, and no judge requested a vote for en banc consideration.

The petition for rehearing and the petition for rehearing en banc are **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

IKUTA, Circuit Judge:

Sussex and other petitioners (collectively, "Sussex") seek a writ of mandamus directing a district court to vacate its grant of a motion, while arbitration was pending, to disqualify an arbitrator for evident partiality under 9 U.S.C. § 10(a)(2). We have jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651, and hold that mandamus is warranted under the circumstances of this case. *See Bauman v. U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977). We therefore grant the petition.

I

In the litigation giving rise to this petition for a writ of mandamus, hundreds of purchasers of condominium units in a luxury condominium project brought several different civil actions against the developer and seller of the project, Turnberry/MGM Grand Towers, LLC, and several affiliates (collectively, "Turnberry"), raising a wide range of fraud and other claims, and seeking rescission of their purchase agreements or money damages. Two separate lawsuits raising substantially identical claims, *Sussex et al. v. Turnberry/MGM Grand Towers, LLC et al.*, No. 2:08-cv-0773, and *Abraham et al. v. Turnberry/MGM Grand Towers, LLC et al.*, No. 2:11-cv-01007, were filed in district court, and were subsequently consolidated for purposes of the motion at issue here. A third action raising similar claims was filed in Nevada state court, *KJH & RDA Investor Group, LLC et al. v. Turnberry/MGM Grand Towers, LLC et al.*, No. 51159.

All of the plaintiffs had entered into the same form condominium purchase and sale agreement, in which they agreed "to submit to arbitration any dispute" related to the agreement and agreed that any arbitration would be conducted under the rules of the American Arbitration Association (AAA). *Sussex* and *KJH* were submitted to arbitration in 2009.

In February 2010, the AAA appointed Brendan Hare, an attorney in private practice, to serve as arbitrator for *Sussex*. He would eventually become the arbitrator for all three cases (*Sussex*, *Abraham* and *KJH*). The arbitration process in *Sussex* commenced in February 2011. Around the same time, Hare became involved in some business ventures to finance litigation for investment purposes. He founded Bowdoin Street Capital, a firm that "invests in high-value, high-probability legal claims and litigations," including "all manner of meritorious claims," and created a website to attract investors to the firm. A few months later, Hare participated as a panelist in the Litigation Finance and Investment Summit in New York, on a panel entitled "Perspectives on Investing in Litigation and Legal Finance Companies" addressing "the drivers for investing in litigation finance, including expected returns, assembling a portfolio, and risk assessment/risk mitigation." Hare participated in a similar panel in March 2012. In February 2013, his online LinkedIn profile stated that he had "recently refocused his practice to concentrate on the emerging field of Litigation Finance and Funding." Hare filled out a new conflicts disclosure form in February 2012, but did not disclose these litigation financing activities.

After learning about Hare's creation of Bowdoin and efforts in the field of litigation financing, Turnberry made

several requests to the AAA to disqualify Hare and stay the arbitration. The AAA investigated Turnberry's charge that Hare's involvement with Bowdoin created a conflict of interest. In response to the AAA's inquiry, Hare stated that Bowdoin was "an entity I created to explore the possibility of creating a fund to provide capital for litigation," but stated that he had "raised no money, and made no investments" and "[e]xcept for a vestigial web presence" the company was "completely dormant." The AAA subsequently denied Turnberry's requests for Hare's disqualification.

While the AAA was considering these objections, Turnberry moved to disqualify Hare in the state case, *KJH*. After some litigation in state courts, the *KJH* plaintiffs agreed to proceed without Hare. In September 2013, Turnberry then filed motions to disqualify Hare in the *Sussex* and *Abraham* cases pending in district court. The district court granted an emergency request to stay the arbitration in the two consolidated cases.

In an order issued on December 31, 2013, the district court granted Turnberry's motion to disqualify Hare. The district court ruled that it had the authority to intervene in the ongoing arbitration, citing *Aerojet-General Corp. v. Am. Arbitration Ass'n*, 478 F.2d 248 (9th Cir. 1973), for the proposition that intervention in ongoing arbitration proceedings was possible in "extreme cases." The district court then determined that intervention was warranted in this case, in light of several factors. First, the consolidated arbitrations were large, involving the claims of 385 plaintiffs. Second, the proceedings were still in the early stages. Discovery had not yet begun, and Hare had issued only preliminary rulings. The district court also noted that the state case, *KJH*, would be proceeding with a new arbitrator.

Finally, the district court held that at the end of the arbitration, Turnberry would be likely to prevail on a motion to vacate any award Hare issued on the ground of "evident partiality," a basis for vacating an arbitration award under the Federal Arbitration Act, 9 U.S.C. § 10(a)(2).[1] The district court reasoned that the undisclosed facts regarding Hare's litigation financing activities suggested he had a financial interest in the outcome of the arbitration, because a victory and large financial award for Sussex would help Hare promote his company, which was designed to generate profits from funding large, potentially profitable litigations. According to the district court, Hare's business venture would create a reasonable impression of bias sufficient to meet the § 10(a)(2) standard. If the award were vacated, the parties would have to repeat the arbitration process, which would result in a waste of time and resources. Accordingly, the district court entered an order removing Hare from the federal cases. Sussex filed a timely petition for writ of mandamus.

## II

"A writ of mandamus is an extraordinary or drastic remedy, used only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *DeGeorge*

---

[1] 9 U.S.C. § 10(a)(2) provides:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration— . . .

> (2) where there was evident partiality or corruption in the arbitrators, or either of them . . . .

*v. U.S. Dist. Court*, 219 F.3d 930, 934 (9th Cir. 2000) (citation and internal quotation marks omitted). A "judicial readiness to issue the writ of mandamus in anything less than an extraordinary situation" would defeat longstanding Congressional policy against appellate review before final judgment in the district court and would result in piecemeal litigation. *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976). A petitioner must therefore prove a right to issuance of the writ that is "clear and indisputable." *DeGeorge*, 219 F.3d at 934 (quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 384 (1953)).

In determining whether a petitioner has carried the burden of establishing a "clear and indisputable" right to issuance of the writ, we examine the five factors set forth in *Bauman v. U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977):

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Bauman*, 557 F.2d at 654–55 (citations omitted). We weigh these factors together to determine whether, on balance, they justify the invocation of "this extraordinary remedy." *Id.* at

654–55 (internal quotation marks omitted). The factors are not to be "mechanically applied"; we are neither compelled to grant the writ when all five factors are present, nor prohibited from doing so when fewer than five, or only one, are present. *Cole v. U.S. Dist. Court*, 366 F.3d 813, 817 (9th Cir. 2004). "[I]nstead, the decision whether to issue the writ is within the discretion of the court." *Id.* (citing *Kerr*, 426 U.S. at 403).

Because we have held that "the absence of factor three—clear error as a matter of law—will always defeat a petition for mandamus," *DeGeorge*, 219 F.3d at 934 (internal quotation marks omitted), we begin by determining whether the district court committed clear error by intervening mid-arbitration to remove Hare. Although the clear error standard is "highly deferential," *In re Van Dusen*, 654 F.3d 838, 841 (9th Cir. 2011), we have held that "a definite and firm conviction that a mistake has been committed" weighs in favor of granting the writ, *Cohen v. U.S. Dist. Court*, 586 F.3d 703, 708 (9th Cir. 2009) (internal quotation marks omitted).

## III

In order to address this question of clear error, we begin by reviewing the usual, limited role of the district courts in arbitration, and then we assess whether the district court exceeded this role in a way that was clearly erroneous.

## A

The Federal Arbitration Act provides that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be

valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As we have interpreted the Act, a district court's authority is generally limited to decisions that bookend the arbitration itself. Before arbitration begins, the district court has the authority to determine whether there is a valid arbitration agreement between the parties, and if so, whether the current dispute is within its scope. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the court determines that the arbitration agreement is valid and "encompasses the dispute at issue," the Act requires the district court to enforce the agreement by ordering the parties to arbitrate their dispute. *Id.*; 9 U.S.C. § 4. The district court's involvement ordinarily stops at that point; courts are authorized to act only in narrow circumstances such as naming a replacement arbitrator or compelling witnesses to testify at an arbitration hearing. *See* 9 U.S.C. §§ 5, 7. The statute does not suggest that a court could otherwise intervene before a final award is made.[2]

After a final arbitration award, the parties may petition the district court to affirm the award, *id.* § 9, or to vacate, modify, or correct it, *id.* §§ 10–11. "The [Federal Arbitration Act] gives federal courts only limited authority to review arbitration decisions, because broad judicial review would diminish the benefits of arbitration." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). Section 10(a) of the Act lists four narrow grounds for

---

[2] An arbitrator's interim decision that is final as to a distinct issue may also be reviewable in some circumstances. *See, e.g.*, *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022–23 (9th Cir. 1991).

vacating an arbitral award, including "evident partiality or corruption in the arbitrators, or either of them." *Id.* § 10(a).

The Supreme Court has made clear that courts have only a limited role to play when the parties have agreed to arbitration. Before the Federal Arbitration Act was passed, the Court explained, "American courts were generally hostile to arbitration" and "refused, with rare exceptions, to order specific enforcement of executory agreements to arbitrate." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 593 (2008) (Stevens, J., dissenting). Congress's core purpose in passing the Act was to curb this "judicial hostility towards arbitration." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1747 (2011). For this reason, in the context of arbitrability determinations, the Court has adopted the view that the Act, "both through its plain meaning and the strong federal policy it reflects, requires courts to enforce the bargain of the parties to arbitrate, and not substitute its own views of economy and efficiency for those of Congress." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985) (internal quotation marks and alterations omitted). The Court has also made clear that motions to vacate will be granted "only in very unusual circumstances" to prevent arbitration from becoming "merely a prelude to a more cumbersome and time-consuming judicial review process." *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) (internal quotation marks omitted).

We first addressed the question of authority to intervene in an ongoing arbitration in *Aerojet-General*. In that case, after a state court ordered two parties to proceed with arbitration, one of the parties filed an action in district court to object to the AAA's chosen venue for the arbitration. 478 F.2d at 249–50. The district court enjoined the parties

from proceeding with the arbitration pending a trial on the question of whether the venue selection was reasonable. *Id.* at 251. On appeal of the injunction, we addressed the threshold question, "whether judicial scrutiny of arbitration proceedings is *ever* appropriate prior to the rendition of a final arbitration award." *Id.* We concluded that "judicial review prior to the rendition of a final arbitration award should be indulged, *if at all*, only in the most extreme cases." *Id.* (emphasis added). We noted the considerations that weighed heavily against a mid-arbitration intervention, explaining that "[t]he basic purpose of arbitration is the speedy disposition of disputes without the expense and delay of extended court proceedings," and that "[t]o permit what is in effect an appeal of an interlocutory ruling of the arbitrator would frustrate this purpose." *Id.* In an abundance of caution, we refrained from ruling "that immediate judicial review of a ruling setting the place for arbitration is never justified," noting the remote possibility of an extreme case that could cause "severe irreparable injury" from an error that "cannot effectively be remedied on appeal from the final judgment" and that would result in "manifest injustice." *Id.* Nevertheless, we held that the dispute over venue in *Aerojet-General* was "emphatically not such a case." *Id.*

While refraining from issuing a blanket rule precluding intervention in an ongoing arbitration, we came quite close in *Aerojet-General*, and never subsequently approved of such an intervention. *See, e.g.*, *Orion Pictures Corp. v. Writers Guild of Am., West, Inc.*, 946 F.2d 722, 725 n.2 (9th Cir. 1991) (holding an arbitrator's jurisdiction determination to be an adverse preliminary ruling, not a final, reviewable order under the Labor Management Relations Act, and declining to apply *Aerojet-General*); *cf. Pac. Reinsurance Mgmt.*,

935 F.2d at 1022–23 (holding that the order at issue was final and reviewable, so *Aerojet-General* was not implicated).

The majority of our sister circuits expressly preclude any mid-arbitration intervention. *See Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co.*, 748 F.3d 708, 717–18 (6th Cir. 2014) (observing that although "the laws are largely silent" on interlocutory review of arbitration decisions, "our court and several of our sister circuits have interpreted that silence . . . to preclude the interlocutory review of arbitration proceedings and decisions," and collecting cases from the Second, Third, Fourth, Fifth, Sixth, Seventh and D.C. Circuits); *see also Smith v. Am. Arbitration Ass'n*, 233 F.3d 502, 506 (7th Cir. 2000); *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 n.4 (2d Cir. 1980). As the Seventh Circuit has succinctly summarized the majority view, "[r]eview [of an arbitration proceeding] comes at the beginning or the end, but not in the middle." *Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011). This rule applies with equal force to claims of arbitrator partiality. *See, e.g.*, *Smith*, 233 F.3d at 506 ("The time to challenge an arbitration, on whatever grounds, including bias, is when the arbitration is completed and an award rendered."). However, we need not address the precise scope of the *Aerojet-General* exception because, as we discuss in the next section, this is clearly not an "extreme case" in which mid-arbitration intervention could be justified.

B

We now consider whether the district court clearly erred by intervening in the ongoing arbitration. The district court determined that intervention was warranted in this case because the arbitrator's award would likely be vacated at the

conclusion of the arbitration, and such a result would lead to further delays and expenses. We conclude that the district court's ruling was clearly erroneous as to the legal standard for "evident partiality" and the nature of the equitable concerns sufficient to justify a mid-arbitration intervention.

First, the district court erred in predicting that an award issued by Hare would likely be vacated because of his "evident partiality" under 9 U.S.C. § 10(a)(2). In the foundational case of *Commonwealth Coatings Corp. v. Continental Cas. Co.*, the Supreme Court ruled that an arbitrator's failure to disclose the fact that he had been involved in business dealings with one of the parties to the arbitration over the prior five to six years created an "impression of possible bias," and therefore required the vacatur of the arbitration award, even though there was no evidence of actual bias. 393 U.S. 145, 146–49 (1968). Holding that *Commonwealth Coatings* created a "reasonable impression of partiality" standard, we clarified that its standard differed from the strict standards applicable to judges, because "arbitrators will nearly always, of necessity, have numerous contacts within their field of expertise . . . [and] have many more potential conflicts of interest than judges." *Schmitz v. Zilveti*, 20 F.3d 1043, 1046 (9th Cir. 1994); *see also Commonwealth Coatings*, 393 U.S. at 148 (observing that "arbitrators cannot sever all their ties with the business world"). As Justice White recognized, "an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography." *Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring).

In applying this standard, we have held there was "evident partiality" in cases that involved direct financial connections between a party and an arbitrator or its law firm, or a concrete possibility of such connections. *See Schmitz*, 20 F.3d at 1044, 1049; *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1103 (9th Cir. 2007). In *Schmitz*, we held that facts undisclosed by the arbitrator created a reasonable impression of partiality because the arbitrator's law firm had represented a party's parent company in at least 19 cases over 35 years; one case had ended only 21 months before the arbitration. 20 F.3d at 1044. In *New Regency*, we held that the undisclosed fact that the arbitrator was an executive of a company that was negotiating with a party's executive about producing a significant film project was sufficient to create a reasonable impression of partiality. 501 F.3d at 1103.

In contrast, we have recognized, courts have rejected claims that undisclosed facts relating to "long past, attenuated, or insubstantial connections between a party and an arbitrator" created a reasonable impression of partiality. *New Regency*, 501 F.3d at 1110. In *Lagstein v. Certain Underwriters at Lloyd's, London*, an arbitrator failed to disclose that he had been involved in an ethics controversy that had led to his appearing before one of his co-arbitrators (then a judge), who had made several rulings in his favor. 607 F.3d 634, 639 (9th Cir. 2010). We held the non-disclosure insufficient for vacatur, and explained that vacatur could not be required "simply because an arbitrator failed to disclose a matter of some interest to a party." *Id.* at 646. Rather, arbitrators must disclose facts showing they "might reasonably be thought biased against one litigant and favorable to another." *Id.* (emphasis omitted) (quoting *Commonwealth Coatings*, 393 U.S. at 150). The litigant's challenge to the arbitrator in *Lagstein* failed because it did not

show any connection between the parties to the arbitration and any of the arbitrator's past ethical difficulties "that would give rise to a reasonable impression of partiality" towards one of the litigants. *Id.*

Under these precedents, the undisclosed facts regarding Hare's modest efforts to start a company to attract investors for litigation financing do not give rise to a reasonable impression that Hare would be partial toward either party. Turnberry concedes that no relationship existed between Hare and either party, and Hare's potential ability to profit from a large award to Sussex can best be described as "attenuated" and "insubstantial." *New Regency*, 501 F.3d at 1110. Such a description is particularly apt given the dormant nature of Hare's business efforts and the speculative nature of Turnberry's theory that Hare could use Sussex's success to convince investors to give him their business. This alleged financial interest is far less substantive than a longstanding relationship between an arbitrator's firm and a party's parent company, *see Schmitz*, 20 F.3d at 1044, 1049, or direct negotiations between the arbitrator's and a party's companies over a major project, *see New Regency*, 501 F.3d at 1103. Viewed in light of our case law, the financial relationship in this case is contingent, attenuated, and merely potential, *see id.* at 1110; *Schmitz*, 20 F.3d at 1044, 1049, and would not give a court grounds to vacate an award for evident partiality.

Second, even if Hare's undisclosed activities did create a reasonable impression of partiality, the district court's equitable concern that delays and expenses would result if an arbitration award were vacated is manifestly inadequate to justify a mid-arbitration intervention, regardless of the size and early stage of the arbitration. We have repeatedly held that financial harm is insufficient to justify collateral review;

"mere cost and delay," *see DeGeorge*, 219 F.3d at 935, is no different from the injury a party wrongfully denied summary judgment experiences when forced to go to trial, and we have "consistently rejected . . . [the] position that the costs of trying massive civil actions render review after final judgment inadequate," *In re Cement Antitrust Litig. (MDL No. 296)*, 688 F.2d 1297, 1303 (9th Cir. 1982) (internal quotation marks omitted). The same rule applies in the arbitration context. Moreover, even assuming that a mid-arbitration intervention could be permissible under some extreme circumstances, cost and delay alone do not constitute the sort of "severe irreparable injury" or "manifest injustice" that could justify such a step. *See Aerojet-General*, 478 F.2d at 251. This case is "emphatically not" such an extreme case, if one exists, that could cause us to diverge from our practice, consistent with other circuits, of declining to intervene in an ongoing arbitration. *See id*. Because we are left with "a definite and firm conviction that a mistake has been committed," *see Cohen*, 586 F.3d at 708 (internal quotation marks omitted), this factor favors granting the writ.

IV

Having determined that the district court's decision to intervene was clear error, we now turn to the remaining *Bauman* factors, and conclude that they weigh in favor of granting "this extraordinary remedy," *see Bauman*, 557 F.2d at 654 (internal quotation marks omitted), to prevent errors in applying our circuit's precedent regarding mid-arbitration intervention.

Under the first two *Bauman* factors, we consider whether Sussex lacked other adequate means of relief or would be damaged or injured in a way not correctable on appeal. *In re*

*Cement*, 688 F.2d at 1301. The injury at issue here is mid-arbitration intervention and the removal and replacement of an arbitrator, both of which have a disruptive effect on proceedings that are supposed to be speedy and efficient. Such an injury is not correctable on appeal; if we do not grant the writ, the case will proceed to an award under a new arbitrator. But the delay and disruption caused by the court's intervention is likely not significant enough to justify the extraordinary remedy of mandate. *Bauman*, 557 F.2d at 657 (holding the "delay and the additional expenditure of judicial and private resources" that would result when the class size was reduced or the class action foreclosed following denial of the writ would be insufficient to justify mandamus); *but see In re Cement*, 688 F.2d at 1303 (holding that a judge's erroneous decision to recuse himself, causing petitioners to incur additional cost and unreasonable delay, raised "a substantial question as to whether petitioners have demonstrated the kind of injury that would be necessary to justify the invocation of our mandamus authority in a traditional mandamus case").

Nevertheless, even when the injury to the parties is insufficient on its own, the balance may tip in favor of granting the writ when the error at issue could also injure the operation of the courts. *See In re Cement*, 688 F.2d at 1303. Here, the district court's interference in ongoing arbitration proceedings raises the specter of such an injury, because the district court's mistaken application of *Aerojet-General* in a published order may cause confusion, encourage similar erroneous approaches, and leave district courts to wonder whether and when to intervene. This concern also implicates the fifth *Bauman* factor, which directs us to consider whether the petition raises new and important problems or issues of

law of first impression.[3]  Because no district court in our circuit had previously interpreted *Aerojet-General* to allow mid-arbitration intervention, and the potential impact of this ruling raises substantial concerns, the fifth factor weighs in favor of granting the writ.

We conclude that the third and fifth *Bauman* factors, along with the first and second *Bauman* factors to a lesser extent, weigh in favor of granting Sussex's petition for mandamus.  Given the importance of this novel issue, we conclude that this is one of those rare cases contemplated in *Bauman*.  We therefore grant the writ and direct the district court to vacate its order removing Hare.

**PETITION GRANTED.**

---

[3] The fourth factor, whether the district court's order is an oft-repeated error or shows a persistent disregard of federal rules, is not implicated here.  *See DeGeorge*, 219 F.3d at 934.